David Douglas BREWSTER,
Appellant (Plaintiff),

v.

SALVESON CONSTRUCTION, INC., a
Wyoming corporation, Appellee
(Defendant).

No. 88–68.

Supreme Court of Wyoming.

Dec. 15, 1988.

George Zunker and Ronald E. Triggs of Sullivan & Zunker, Cheyenne, for appellant.

Richard P. Boley of Lathrop, Rutledge & Boley, P.C., Cheyenne, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

This is an appeal from an order granting summary judgment to the general contractor, Salveson Construction Inc. (Salveson), and against appellant David Douglas Brewster (Brewster), an independent contractor's employee. This case requires us to apply our analysis in *Hill v. Pacific Power and Light Company*, 765 P.2d 1348 (Wyo. 1988). As a result, we affirm the summary judgment.

Our standard of review of an order granting summary judgment appears in *Johnston v. Conoco, Inc.*, 758 P.2d 566, 568 (Wyo.1988). We apply that standard here.

The State of Wyoming, by the Board of Charities and Reform, contracted with Salveson to move dirt for site preparation and to lay underground plumbing in relation to the construction of the Wyoming Women's Center (Center) in Lusk, Wyoming. In turn, Salveson subcontracted with Empire Mobile Plumbing, Inc. (Empire) to perform the plumbing work, and more specifically, to construct water and sewer lines to and from the Center site. Empire employed Brewster as a backhoe operator and laborer.

On or before October 26, 1982, Salveson had completed its site grading operation on the job site and removed its personnel and equipment from the job site. Salveson's site preparation work, including all fill, compaction and grading, had been completed and was in the condition as finally accepted by the project's engineers as of October 26, 1982.

On October 27, 1982, a water line previously laid by Empire developed a leak. Only Empire employees were at this water line leak site on this day. At 8:00 a.m., Empire's backhoe operator, Don Watson, opened a trench in which the leaking water line lay. Watson was responsible for the manner in which the trench was opened. Also operating a backhoe on this day was Brewster, who had been assigned that work activity by Empire's president, John Barry. Brewster's co-employee, Marty Wayne Moody, began working in the trench around 9:00 a.m.; the trench contained about one and one-half feet of standing water. The trench conformed to other trenches previously dug by Empire, and the walls were not shored and not graded to an angle of repose.

According to Brewster, his personal habit was to grade trench walls to an angle of repose. During the time Brewster and Moody worked for Empire, no materials were ever available to shore a trench or other excavation.

After Brewster's co-employee Watson opened the trench, and at a time when the trench was in essentially the same condition as when it collapsed causing Brewster's injury, Empire's Barry arrived at the site and twice inspected the excavation. Barry at no time requested that shoring materials be used or that the trench site be graded to an angle of repose. Shortly after Barry's inspection, Moody asked backhoe operator Watson to increase the grade on the walls as several portions of the trench had previously fallen. Watson dug away a portion of the right side of the excavation, but not the full length of the trench. Watson did not grade the trench to an angle of repose; rather, he simply cut away a portion of it to permit additional working room and to try preventing the wall's collapse.

Around 3:45 p.m. that day, Empire's crew supervisor, Loren Malone, ordered Brewster to bail water from the trench, which still stood at one and one-half feet. Malone, acting under authority given by Empire's Barry, was in charge of the site and the excavation at all times that day. Brewster said he was in the trench bailing water for only a few minutes when the trench collapsed, causing his injury.

According to Empire's Barry, Salveson's expertise was not in the plumbing area; Empire was hired as a plumbing contractor or utility contractor because that was its area of expertise. Under the written subcontract agreement between Salveson and Empire, Empire was to:

1. furnish all material and perform all work necessary to complete the work in accordance with the general conditions, special conditions, plans and specifications and contract documents between Salveson and the state;

2. comply with all applicable state and federal statutes as well as applicable rules and regulations of state and federal regulatory bodies, including federal OSHA;

3. indemnify Salveson from liability for injuries to persons on account of any act or omission of Empire or Empire's employees;

4. hold Salveson harmless from all material, labor, and appliance liens and claims asserted by persons furnishing material or labor in connection with the subcontract;

5. employ satisfactory workers who were to work in harmony with Salveson's workers and remove any workers immediately who were not satisfactory to Salveson; and

6. furnish all tools, equipment, scaffolding, etc., connected with its work.

According to Brewster, Empire was supposed to have safety meetings every Monday morning before the work started. Only two meetings were held, at which only general safety subjects were discussed. At one meeting the employees discussed the buddy system in trenching. After Empire discontinued its safety meetings, Empire's foremen told the employees to sign a mimeograph form to signify attendance at a safety meeting that was never held. According to Empire's Barry, Empire's safety meetings were conducted for the people working in the most hazardous areas, which were the ditches. In Barry's deposition testimony he stated Empire's subcontract agreement with Salveson probably required Empire to conduct safety meetings. He testified that no one from Salveson attended or taught Empire's safety meetings. Further, Barry stated Salveson had no role in Empire's safety program and never issued safety orders to Empire's employees. Barry agreed that Salveson's contract with Empire was limited to making sure Empire complied with the plans and specifications of the contract. Barry also stated that Salveson never asked Empire to dig up pipe and lay it again. In reply to one of several hypothetical questions asked by Brewster's counsel concerning whether Salveson would tell Empire's trench workers to stop digging an unsafe excavation if he saw them doing it, Barry answered, "He would probably come and tell me and then I would go. * * * I don't think Gary Salveson * * * would go and tell anybody else's employees you stop doing that. You generally go to the supervisor or whoever if you're concerned with something."

As the statement of facts shows, Salveson, as movant for summary judgment, presented evidence through deposition testimony, affidavit testimony, and the Salveson–Empire subcontract agreement establishing that no genuine issue of material fact existed concerning Empire's being an independent contractor and Salveson's: 1) not retaining the right to control Empire's work in repairing the leaking water line which flooded the trench that collapsed on Brewster; and 2) not assuming affirmative duties for the safety of Empire's repair work on the water line in that trench.

Because of Salveson's evidentiary presentation, the burden then shifted to Brewster to present facts refuting Salveson's showing. Brewster failed to carry that burden. Salveson's unrefuted evidentiary showing fits within the rule followed in *Hill.*

AFFIRMED.