Michael Dean COCKBURN and Melinda
"Mickie" K. Cockburn, Appellants
(Plaintiffs),

v.

TERRA RESOURCES, INC., a Delaware
corporation; and George Ogden,
Appellees (Defendants).

No. 89–161.

Supreme Court of Wyoming.

June 29, 1990.

Daniel M. Hesse, Meyer & Williams, P.C., Jackson, for appellants.

Michael K. Davis, Redle, Yonkee & Toner, Sheridan, for appellee Terra.

Robert D. Olson and James M. Guill, Goppert, Olson & Guill, Cody, for appellee Ogden.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

THOMAS, Justice.

The question common to all the errors asserted in this appeal is whether the record demonstrates genuine issues of material fact that require a jury trial. The claimed issues of material fact relate to the retention of control by an operator of an oil and gas lease over the premises or the details of the work, resulting in its liability to an injured worker employed by the drilling firm, and the culpable negligence of a supervising co-employee of the injured worker. Michael Dean Cockburn and his wife, Melinda "Mickie" K. Cockburn, (Cockburn) contended that there were genuine issues of material fact relating to the retention of control by Terra Resources, Inc. (Terra), the operator of the oil and gas lease, arising out of the provisions of the drilling contract and the actual assumption of the power to direct the details of the work of employees of the driller. Cockburn also asserted that the record demonstrated genuine issues of material fact with respect to the culpable negligence of George Ogden (Ogden), the driller on the rig on which Cockburn was employed. The district court concluded that there were no genuine issues of material fact as to either the retention or exercise of control by Terra or the culpable negligence on the part of Ogden, and it entered a summary judgment in favor of both defendants. Our examination of the record in the light of pertinent authority persuades the court that the dis-

trict court properly entered the summary judgment in favor of both Terra and Ogden. We affirm the summary judgment.

In the Cockburn brief, the following issues are stated:

"Is it error for the trial court to grant summary judgment to the operator of an oil well where the operator of the well, who has employed an 'independent contractor,' retains control over the details of operations performed on a daywork basis?

"Is summary judgment precluded where the operator of an oil well departs from an independent contractor relationship and assumes the power to direct the details of the work of employees of the independent contractor?

"Where a co-employee charged with supervisory duties has knowledge of a hazardous condition and fails to correct it, does a genuine issue of material fact exist regarding his culpable negligence, and is the granting of summary judgment in his favor proper?"

Terra, as appellee, rephrases those issues that pertain to it in this way:

"Is a well owner or operator such as Terra who contracts with an independent drilling contractor responsible to the drilling contractor's employees for defects in the drilling contractor's equipment causing injury to the employees?"

Ogden restated the issue pertaining to him as follows:

"Did any genuine issue of material fact exist regarding whether or not appellee was culpably negligent which precluded the Court from granting Appellee's Motion for Summary Judgment?"

On April 30, 1986, Cockburn was working for Shelby Drilling, Inc. (Shelby) as a drilling hand on "Shelby Rig 56" in Park County, Wyoming. Cockburn and the other members of the crew on the rig were "tripping out" the drilling pipe in the well. This process involves drawing the drilling pipe from the well hole; unscrewing it into appropriate lengths; and then "stacking" the sections of drill pipe vertically in a rack on the drilling rig with the bottom end placed in a device called an "alligator tail"

or "gator back." Each "stand" of pipe is normally between eighty-five to ninety feet in length and weighs approximately a ton. In colder climates such as Wyoming, the pipe is stacked on "alligator tails" so that the bottom end is kept open to permit drainage of water and drilling fluids from the pipe. If this vertical stacking does not occur, ice can form in a stand of pipe, resulting in a dangerous condition when the pipe is later inserted into the well hole and re-pressurized. The procedure of "tripping out" the pipe is a routine operation for experienced oil field workers, and it normally creates very little danger or concern.

"Alligator tails" are most often made from sections of pipe that have been split longitudinally. Metal rods, called "ears" or "tri-pegs," then are welded to the upturned circumference of the pipe. The name is derived from the resemblance of these devices to the bumpy back of an alligator when the racks are laid with the "ears" up. The "alligator tails" on Shelby Rig 56 were of a different design, however. Instead of using pipe that had been split in half, those alligator tails utilized a full pipe. Two pieces of the pipe were welded together, and the metal "ears" were attached on one side of the welded device. This style of "alligator tail" does not have the rough contact points that the split pipe version has and, apparently, is more prone to sliding.

At the time of Cockburn's accident, he was on the floor of the rig approximately sixteen feet above the ground. A section of drill pipe was being "stabbed," that is stacked, onto one of these modified "alligator tails;" the device slipped; and it pinned Cockburn's leg between the "alligator tail" and the pipe. The "alligator tails," which were owned and maintained by Shelby, were not secured to the rig floor in any fashion. Cockburn, the "alligator tail," and the entire "stand" of pipe then slid approximately nineteen feet down the "beaver slide" to the ground. The "beaver slide" is a metal access ramp running from the ground up to the floor of the rig. A set of doors, known as "V-doors," was in-

stalled at the top of the beaver slide, but was open at the time of Cockburn's injury. Cockburn suffered injuries to his shoulder and knee in the accident.

On April 30, 1987, Cockburn, with his wife as co-plaintiff, filed his action against Terra and Ogden. The complaint alleged that Terra had retained control over the operation of the drilling rig and over the Shelby employees and that both Terra and Ogden were culpably negligent. On January 9, 1989, Terra filed a motion for summary judgment contending that it owed no duty of care to Cockburn that would justify a finding of liability under the circumstances of the case. Ogden filed a motion for summary judgment as well in which he contended that his conduct did not rise to the level of culpable negligence. The district court, upon reviewing the materials submitted by all parties in support of, and opposition to, the motions for summary judgment, found no genuine issue of material fact and ruled that both Terra and Ogden were entitled to judgment as a matter of law. Cockburn's appeal is from the summary judgment that was entered.

The materials in the record demonstrate that Shelby was hired as an independent contractor by Terra and that Shelby's obligations under the contract included the duty to provide a drilling rig, all related equipment, and the materials and labor necessary to operate the rig. Terra, according to the record, is an investment company engaged in the business of obtaining oil and gas leases, contracting for the completion of drill holes, and producing oil and gas from wells where those minerals are found.

Terra, as Operator, and Shelby, as Contractor, entered into a written drilling contract. It spoke to the relationship between Shelby and Terra in this language:

"14. INDEPENDENT CONTRACTOR RELATIONSHIP:

"14.1 Contractor shall be an independent contractor with respect to all work hereunder and neither contractor nor anyone employed by contractor shall be deemed for any purpose to be the employee, agent, or representative of Operator in the performance of any work or service or any part thereof in any manner dealt with hereunder. Operator shall have no direction or control of Contractor or its employees and agents except in the results to be obtained. The work contemplated herein shall meet the approval of the Operator and be subject to the general right of inspection herein provided for Operator to secure the satisfactory completion thereof.

"14.2 The actual performance and superintendence of all work hereunder shall be by Contractor, but Operator or its representatives shall have unlimited access to the premises to determine whether work is being performed by Contractor in accordance with all of the provisions of this agreement."

The contract also provided that Shelby was required to maintain worker's compensation coverage. Shelby was to be paid for its services under the contract on either a "footage" or a "daywork" basis. With respect to the payment for "footage" or "daywork," a segment of the contract that is pertinent to Cockburn's argument, the contractual language reads:

"3. BASIS OF COMPENSATION:

\* \* \* \* \* \*

"3.2 The term 'daywork' shall be defined as, and apply to, the work performed by Contractor at direction of Operator (\* \* \*) at a stipulated rate per day as distinguished from work for which Contractor is compensated at a stipulated rate per foot of hole drilled. For purposes hereof and subject to Paragraph 14 of the Drilling Contract, the term 'daywork basis' means Contractor shall furnish equipment and labor and perform services as herein provided, for a specified sum per day. When operating on a daywork basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for liabilities and obligations specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations of both parties while on a daywork basis,

including results and all other risks or liabilities incurred in or incident to such operations. When work is performed on a daywork basis, provisions of this Agreement applicable to drilling on a footage basis shall not apply.

"3.3 For purposes hereof, the term 'footage basis' means Contractor shall furnish the equipment and labor and perform services as herein provided to drill a well or wells to the contract footage depth specified to earn and be paid at the stipulated price per foot of hole drilled. While drilling on a footage basis, Contractor shall direct, advise and control drilling operations and assumes certain liabilities to the extent specifically provided for herein. For work performed on a footage basis, contractor's compensation shall be calculated by multiplying the rate agreed upon by linear footage or hole drilled. Such linear footage or hole drilled shall be determined in the manner specified in the drilling order. Notwithstanding the above provisions, while drilling on a footage basis, the following work shall nevertheless be performed on a daywork basis.

"a. All drilling below the contract footage depth, * * *."

Shelby further agreed to carry insurance that would protect any of its employees who were not covered by the Wyoming Worker's Compensation Act.

Cockburn and Terra are in accord that Shelby had reached the contract footage depth and was being compensated for "daywork" at the time Cockburn was injured. Cockburn contends, and Terra disputes, that this shift from "footage" to "daywork" compensation adjusts responsibility under the contract for the safety of Shelby's employees while Shelby was being compensated for "daywork." The contract does not address this subject specifically, but it does include a clause pursuant to which Shelby, without regard to the negligence of any party, agrees to indemnify Terra against all claims arising in connection with injury or death accruing to any of its employees. A similar clause was incorporated in favor of Shelby with respect to claims asserted by Terra employees.

It is customary in the oil business for operators to leave a "company man" on the job site to monitor the progress of drilling activities. This case is no exception, and Terra had a representative present at the drilling site. The record does not disclose that this representative ever took any affirmative action with regard to the drilling rig or, specifically, the "alligator tails" or that he ever gave any instruction or guidance to the rig hands. Furthermore, the record does not demonstrate that the Terra representative assumed, or indicated that he would assume, any duty to conduct safety inspections. It is clear that he was not at the drill site when Cockburn was injured.

Ogden was the "tool pusher" on this particular job. He was a Shelby employee, and his position was similar to that of a "lead man" or a "foreman." In his capacity, he maintained overall supervisory responsibility with respect to the crew and had discretionary authority to hire or fire workers as necessary. One of his primary responsibilities was to be aware of any unsafe conditions and to remedy those conditions as soon as possible. The deposition testimony and the other materials in the record demonstrate that Ogden attempted to carry out his duties by making periodic safety inspections. At the time of Cockburn's injury, Ogden was Cockburn's supervisor and was familiar with the modified "alligator tails" that were in use. Cockburn contends that Ogden had been advised prior to the accident of the dangers surrounding these devices, but he kept them in service despite this advice. The crew which was on the job, known in the oil fields as a "tower," consisted entirely of competent and experienced workers.

Cockburn endeavored to establish liability on the part of Terra by two separate, but related, theories. The first theory advances the proposition that, when an operator retains or exercises a degree of control over the premises where the work is being performed, the operator is liable for its own negligence with respect to an injured worker even though the injured worker is directly employed and supervised by an

independent contractor in performing the work that he was hired to do. *See Ruhs v. Pacific Power & Light Company*, 671 F.2d 1268 (10th Cir.1982); *Stephenson v. Pacific Power & Light Company*, 779 P.2d 1169 (Wyo.1989); *Jones v. Chevron USA, Inc.*, 718 P.2d 890 (Wyo.1986). Cockburn claims that Terra retained the control alluded to in the cited cases and was negligent by failing to provide him with a safe place to work. Cockburn argues that liability attaches to Terra under these circumstances even though, concededly, he was employed and supervised by an independent contractor and was performing the work the contractor was hired to do. The second theory relies upon vicarious liability and suggests that the retention, or exercise, of control over the details of the operations by Terra results in it not only being liable for its independent negligence, but also vicariously liable for the negligence of Shelby. *See Stephenson; Jones.* Under either of these contentions, actual control, or a retained right of control, is essential to liability and, in the absence of evidence of such control, the Cockburns' case against Terra fails as a matter of law. *Hill v. Pacific Power & Light Company*, 765 P.2d 1348 (Wyo.1988); *Jones.*

In arguing that there exist genuine issues of fact with respect to the retention of control by Terra, Cockburn first relies upon the provisions of the contract between Terra and Shelby. The crux of the argument is that, whatever the situation might be with respect to the "footage" provisions of the contract, whenever Shelby was being compensated on a "daywork" basis, the contract provided that Terra retained the right, and is charged with the obligation, to control the work and the rig. Cockburn points to the material in the record in which Terra's representative admitted to maintaining "complete control" over the rig under "daywork" conditions. Cockburn also relies upon the provision in the drilling contract that defined when the parties were operating on a "daywork" basis and insists that the "daywork" provision of the contract imposed affirmative duties for safety upon Terra whenever work was being accomplished as "daywork."

We have scrutinized the drilling contract and have failed to discover a provision applicable while "daywork" operations were being conducted that, even implicitly, retained the right of control over the details of the work for Terra, or imposed any duty upon it in favor of Cockburn, that was any different from the situation during "footage" operations. Neither is there anything that demonstrates an independent duty of Terra to provide for the safety of Shelby employees. We are in accord with the ruling of the district court, contrary to the Cockburn position, that the "footage" and "daywork" clauses of the contract demonstrate nothing more than a mechanism from which the compensation due Shelby was to be determined, and they do not manifest any intention to assign control over the details of the work to Terra.

■ Cockburn identifies particular phrases in the agreement that, in his view, serve to indicate that Terra retained, or was responsible for, control over the details of the work allocated to Shelby. Cockburn specifically relies upon paragraph 3.2, under the title "Basis of Compensation," which states that the "[t]erm 'daywork' shall be defined as, * * *, the work performed by Contractor *at direction of Operator* (* * *) at a stipulated rate per day as distinguished from work for which Contractor is compensated at a stipulated rate per foot of hole drilled" (emphasis added by Cockburn). In addition, Cockburn points to the language that states "[e]xcept for liabilities and obligations specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations of both parties while on a daywork basis." The material first quoted that Cockburn relies upon does nothing more than define a method of compensation, and the reasonable interpretation of the emphasized language within that phrase is that the language clarifies that the work to be performed at "daywork" rates specifically is only that work ordered or requested and, therefore, "directed" by Terra. *See Marathon Oil Company v. Kleppe*, 407 F.Supp. 1301 (D.Wyo. 1975), *aff'd* 556 F.2d 982 (10th Cir.1977)

(common sense and good faith essential elements of contract construction). Considering the drilling contract as a whole, as our rules demand, the contention by Cockburn that the four words taken out of context granted to Terra some right, or imposed some obligation, to control the details of the operation is untenable. In effect, it structures a conflict with other terms found in the agreement. *See Hensley v. Williams,* 726 P.2d 90 (Wyo.1986); *Rossi v. Percifield,* 527 P.2d 819 (Wyo. 1974). If Cockburn's analysis was strictly applied, the "daywork" provisions would be in effect only when work was being conducted under the control of Terra, but paragraph 3.3, which defines the conditions under which "daywork" compensation accrues, mandates numerous circumstances, including the event actually occurring, that is attainment of the total footage depth provided for in the contract, pursuant to which the "daywork" compensation base would be triggered although no control was exercised by Terra. We recognize this conflict, and we also recognize that the better construction of a contract is one pursuant to which each provision is given a reasonable meaning in light of the parties' purpose and intent. *Hensley; State v. Moncrief,* 720 P.2d 470 (Wyo.1986); *Rouse v. Munroe,* 658 P.2d 74 (Wyo.1983). We reject Cockburn's argument in this regard.

■ In addition, we conclude that the second part of paragraph 3.2 alluded to by Cockburn speaks for itself in including the phrase, "[e]xcept for liabilities and obligations specifically assumed by Contractor." In the rest of the drilling contract, Shelby has agreed to provide all necessary labor and has agreed to maintain adequate insurance, both worker's compensation and private, to protect the workers it hires. In addition, Shelby has agreed to indemnify Terra for any claims brought by its employees. These terms, among others, manifest a clear intention of the parties that Shelby was to assume the liabilities and obligations pertaining to workers for this job. *See Marathon.*

■ We have not ignored the testimony by Terra's representative, in his deposition, that he maintained "complete control" over the rig during "daywork" operations. Beyond this comment, the record does not contain any evidence of any measure of actual control over the details of the work assumed by Terra. The testimony, again out of context, does not serve to structure any genuine issue of material fact. We recognize a very clever course of questioning addressed to the "company man" but, instead of eliciting any fact, that questioning simply evoked an opinion addressing an ultimate issue of law. Under Rule 704, W.R.E., the fact that opinion testimony addresses an ultimate issue no longer serves as an absolute bar to its admissibility, or to consideration by this court in the context of a summary judgment, because opinion is admissible at trial if it is reliable and helpful. *McCabe v. R.A. Manning Construction Company, Inc.,* 674 P.2d 699 (Wyo. 1983). The context of this questioning, however, suggests a somewhat unique problem, and likely would preclude that testimony from being admitted at trial for the purposes which it allegedly serves in the context of summary judgment. The problem is significant because, in considering whether a genuine issue of material fact is demonstrated by the record in a case in which a summary judgment has been granted, we consider only evidence that would be admissible at trial and thus have some impact upon a factual determination. *Hayes v. American National Bank of Powell,* 784 P.2d 599 (Wyo.1989).

In this case, control is relevant only insofar as it serves to establish a duty owed by Terra to Cockburn that, in turn, will support liability if the duty is breached. The existence of such a duty is a question of law to be determined by the court. *Pickle v. Board of County Commissioners of County of Platte,* 764 P.2d 262 (Wyo.1988); *Ely v. Kirk,* 707 P.2d 706 (Wyo.1985); *Caterpillar Tractor Company v. Donahue,* 674 P.2d 1276 (Wyo.1983). The existence of control, or a right of control, is tantamount to establishing a duty in the context of cases like this, and testimony which simply offers a conclusion on that aspect of the duty, even if perceived as reliable, does nothing more than invade the province of

the court. Opinion testimony that invades the province of the court is not to be counted as helpful. Notwithstanding the provision of Rule 704, W.R.E., a conclusion such as the one offered in the testimony by Terra's "company man" cannot be considered as evidence that tends to establish a genuine issue of material fact.

Essentially, the same testimony is relied upon to demonstrate an actual rather than a retained, or reserved, right of control by Terra. The testimony is not helpful in that regard for the same reason that we have articulated with respect to its impact upon the contractual interpretation.

■ The language of the drilling contract is clear and unambiguous and, thus, no genuine issues of material fact arise from it that demand determination by a jury. *See Cliff & Company, Ltd. v. Anderson,* 777 P.2d 595 (Wyo.1989); *Farr v. Link,* 746 P.2d 431 (Wyo.1987). We then consider the appropriate construction of the contractual language and hold that it does not demonstrate any retained control over the details of the operation by Terra. We note again that these parties agreed that "[c]ontractor shall be an independent contractor with respect to all work hereunder * * *." When the plain language of this term of the contract is applied, this agreement demonstrates the intent and understanding of the parties that Shelby was to be an independent contractor for all work performed without regard to whether it was performed on a "daywork" or a "footage" basis. *Marathon; True Oil Company v. Sinclair Oil Corporation,* 771 P.2d 781 (Wyo.1989); *State v. Pennzoil Company,* 752 P.2d 975 (Wyo.1988). The effect of this feature of the contract was to assign to Shelby the control over the details of the work that it agreed to perform pursuant to the contract.

In addition, the parties expressly agreed that "neither contractor nor anyone employed by contractor shall be deemed for any purpose to be the employee, agent, or representative of Operator in the performance of any work or service or any part thereof in any manner dealt with hereunder" and that "[o]perator shall have no direction or control of Contractor or its employees and agents except in the results to be obtained." The record contains no evidence that is contrary to the faithful observance of these conditions by Shelby and Terra, and the situation thus fits our earlier cases that hold that a contract such as this drilling contract defines the relationship actually existing between the parties and that the relationship was that of an employer and an independent contractor. *See Stephenson; Noonan v. Texaco, Inc.,* 713 P.2d 160 (Wyo.1986); *Combined Insurance Company of America v. Sinclair,* 584 P.2d 1034 (Wyo.1978).

Our examination of this record results in agreement with the district court that there are no genuine issues of material fact with respect to the retention by Terra of control over the details of the work performed by Shelby. Further, Terra did not retain or exercise such control as a matter of fact. Consequently, we hold, as a matter of law, that the district court committed no error in granting summary judgment on the Cockburn claim of direct liability on the part of Terra. *Ramsey v. Pacific Power & Light Company,* 792 P.2d 1385 (1990).

■ Addressing Cockburn's claim that Terra was vicariously liable for Shelby's negligence, we follow our consideration of a similar issue in *Hill v. Pacific Power & Light Company,* 765 P.2d 1348 (Wyo.1988). In that case, Pacific Power & Light Company had hired an independent contractor to furnish specified services under an express contract. PP & L was to identify the work to be accomplished and to instruct North American Energy Services Corporation (NESCO), the independent contractor, on how PP & L wanted the work completed. NESCO was to employ and direct the workers needed to accomplish the work and to retain the right to control the workers it hired. Further, NESCO was obligated to maintain worker's compensation coverage. PP & L did retain the right to inspect the work performed by the employees of the independent contractor. There were some factors of the situation in that instance that involved PP & L more in the work being accomplished than Terra was in this in-

stance. Even so, this court, having afforded every beneficial inference to the injured workman, *see Matter of Larsen*, 770 P.2d 1089 (Wyo.1989), affirmed a summary judgment in that case holding that the actions attributed to PP & L, as a matter of law, were neither sufficient indicators of control over the sub-contractor or its employees nor adequate evidence of an assumption of affirmative duties regarding safety. The situation disclosed by the record did not present facts sufficient to refute the general rule that the employer of an independent contractor is not liable for the negligence of the contractor. *Stephenson*, 779 P.2d 1169; *Jones*.

In the *Pacific Power & Light* case, we affirmed the proposition that "the owner of the workplace, who employs an independent contractor and 'retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety *owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the [independent] contractor was hired to perform.'* " *Hill*, 765 P.2d at 1349 (emphasis added), quoting *Jones*, 718 P.2d at 896; *Stockwell v. Morris*, 46 Wyo. 1, 22 P.2d 189 (1933). We clarified, however, this proposition by also invoking the rule that the owner "must retain more than the general right to order the contractors to stop work, to inspect the progress of the work, to make recommendations thereon, or to prescribe alterations or deviations in the work" in order to impose liability under that rule. *Hill*, 765 P.2d at 1350; *Stockwell v. Parker Drilling Company, Inc.*, 733 P.2d 1029 (Wyo.1987). The product of our precedent is that an employer of an independent contractor, although potentially responsible for injuries to employees of the contractor, must assume a controlling and pervasive role in the work being done in order to generate any duty of care sufficient to establish vicarious liability for the negligence of the independent contractor. *See Johnston v. Conoco, Inc.*, 758 P.2d 566 (Wyo.1988).

 Under the standard that is applied, we discern no genuine issue of material fact with respect to the question of vicarious liability for the conduct of Shelby in this instance and conclude that summary judgment appropriately was granted to Terra as a matter of law. *See Larsen*, 770 P.2d 1089; *Robinson v. Bell*, 767 P.2d 177 (Wyo.1989); *Baldwin v. Dube*, 751 P.2d 388 (Wyo.1988). In arriving at our holding, we agree that *Hill* is controlling with respect to vicarious liability accruing to an employer of an independent contractor. The control essential to a finding of liability on a theory of vicarious liability differs in that the control must exist with respect to the worker involved in the injury. Our search of the record in this regard then is only for genuine issues of fact relating to any right retained by Terra to assume control over the details of the work that Shelby agreed to perform in the sense that it could direct the actions of Shelby employees. *See Noonan*, 713 P.2d 160; *Scott v. Fagan*, 684 P.2d 805 (1984). Ordinarily, such a question "is a question of fact for the jury and becomes one of law only when but one inference can be drawn." *Stephenson*, 779 P.2d 1176; *Noonan; Combined;* and *Holly Sugar Corporation v. Perez*, 508 P.2d 595 (Wyo.1973).

We note that, in asserting the vicarious liability theory, Cockburn relies upon the same factual contentions invoked in support of the issue of independent negligence. The only difference is the argument that the control retained by Terra resulted in its being a vicarious employer of Shelby workers. This is a distinction without any difference and does not justify the conclusion that a genuine issue of fact is presented under either theory. We have not been able to identify from the record any retention of control by Terra beyond a "general right to order the contractors to stop work, to inspect the progress of the work, to make recommendations thereon, or to prescribe alterations or deviations to the work." *Hill*, 765 P.2d 1350; *Stockwell*. We agree with the district court that there is no genuine issue of material fact with respect to Terra's vicarious liability. We premise that conclusion upon the absence

of evidence that Terra had a controlling and pervasive role in the work being accomplished. We hold, as a matter of law, that summary judgment appropriately was entered in favor of Terra on the theory of vicarious liability.

This leaves Cockburn's claim that there exist genuine issues of material fact with respect to culpable negligence on the part of Ogden. In this claim also, Cockburn must demonstrate either a genuine issue of material fact or that summary judgment was not proper as a matter of law. *See Case v. Goss,* 776 P.2d 188 (Wyo.1989); *Poulos v. HPC, Inc.,* 765 P.2d 364 (Wyo. 1988). Cockburn's claim is that there exists a genuine issue of material fact. In resolving this contention, we do afford Cockburn the benefit of every favorable inference, and the benefit of every reasonable doubt, regarding the existence of such a fact. *Larsen; Roth v. First Security Bank of Rock Springs,* 684 P.2d 93 (Wyo. 1984).

■ As Cockburn's supervisor, Ogden had a duty to provide a safe workplace. *Stephenson; Case; Barnette v. Doyle,* 622 P.2d 1349 (Wyo.1981). Cockburn still must demonstrate more than ordinary lack of due care resulting in a breach of that duty to justify a recovery. *Stephenson.* Cockburn must demonstrate that Ogden was culpably negligent. Section 27–12–103(a), W.S.1977; *Baros v. Wells,* 780 P.2d 341 (Wyo.1989); *Case; Poulos.*

Culpable negligence invokes standards much more rigorous than the requirements for approving mere negligence and has been commonly defined as willful and serious misconduct. *Brebaugh v. Hales,* 788 P.2d 1128 (Wyo.1990); *Case; Stundon v. Sterling,* 736 P.2d 317 (Wyo.1987); *Barnette.* In the context of this definition, "willful" means conduct that "is done purposely, with knowledge—or misconduct of such a character as to evince a reckless disregard of consequences." *Case,* 776 P.2d at 191; *Bryant v. Hornbuckle,* 728 P.2d 1132, 1136 (Wyo.1986), quoting *Hamilton v. Swigart Coal Mine,* 59 Wyo. 485, 143 P.2d 203, 206, 149 A.L.R. 998 (1943). The factor that is most significant in distinguishing willful misconduct from ordinary negligence is the state of mind of the accused tortfeasor. *Brebaugh; Baros; Case.* "[T]o prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm." *Bryant,* 728 P.2d at 1136. Willful misconduct has to be "more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention." *Danculovich v. Brown,* 593 P.2d 187, 191 (Wyo.1979); *Mitchell v. Walters,* 55 Wyo. 317, 100 P.2d 102 (1940).

■ Even so, the standard is not so demanding that it is necessary to demonstrate that the act was committed with an actual intent to cause injury or damage before recovery can be granted. *Danculovich.* Recklessness that manifests a callous disregard for the consequences is sufficient. In accordance with this last articulation and, further, because a state of mind is generally difficult to prove, willful misconduct can be established by "demonstrating that an actor has intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow." *Bryant,* 728 P.2d at 1136. Cockburn argues that Ogden was advised well prior to the accident that the "alligator tails" presented a dangerous condition and that he chose to ignore these warnings. Cockburn insists that, in so doing, Ogden "committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow." *Bryant,* 728 P.2d at 1136.

■ The record that Cockburn points to in support of his contention includes Cockburn's deposition testimony as follows:

"Q. Did you ever complain to anybody about the alligator tails?

"A. Yes.

"Q. To whom?

"A. George Ogden.

"Q. When was that?

"A. I can't tell you the exact date. While I was drilling for him, though.

"Q. Tell me as best you can what you said to Mr. Ogden.

"A. George, the alligator tails are like a sled. Set a pipe down on them and they take off on you. They need to be cut in half.

"Q. What was his response?

"A. You let me take care of the rig."

Cockburn's answers to interrogatories are consistent with his testimony.

In addition, another co-employee testified that he had commented to Ogden about the "alligator tails" before the accident occurred and that Ogden ignored his comments. A third co-employee testified that he had complained to Ogden that the "alligator tails" were troublesome, heavy, and awkward. Ogden agreed in his deposition that he was responsible for recognizing unsafe conditions on the rig and rectifying them. It was also established, however, that these "alligator tails" were used on many occasions throughout this same period of time without any incident or injury. In light of our duty to afford every favorable inference to Cockburn, we conclude, for the purpose only of reviewing the grant of summary judgment, that Ogden was aware of a dangerous condition relating to the "alligator tails" prior to the accident, and he failed to remedy the problem in fulfillment of his duty.

This conclusion is not sufficient to mandate a reversal in favor of Cockburn, however. A situation in which a supervisory co-employee has knowledge of a hazardous condition and fails to correct it, although certainly sufficient to indicate ordinary negligence, is not sufficient to satisfy the much more stringent test of culpable negligence. *See Brebaugh* (in which is included an extensive summary of recent cases involving standards for culpable negligence). Furthermore, Cockburn has presented no evidence serving to indicate that Ogden's actions were unreasonable, or that he intentionally "committed an act of unreasonable character in disregard of a known or obvious risk that was so great as to make highly probable that harm will follow." *Bryant,* 728 P.2d at 1136. We perceive no genuine issue of material fact for resolution by a jury in light of this record. *See Brebaugh.* This ruling may be particularly appropriate since the "alligator tails" had been repeatedly used without any incident. In light of that factual background, Ogden hardly can be said to have acted in disregard of a known or obvious risk. We hold there were no genuine issues of material fact with respect to the absence of culpable negligence, and we affirm, as a matter of law, the summary judgment in favor of Ogden.

Our scrutiny of this record has resulted in no manifestation of any genuine issue of material fact with respect to any of Cockburn's claims. The summary judgment awarded to the respective defendants was appropriate as a matter of law. The judgment of the district court is affirmed.