2011 WY 8

**Ciro Paolo FORMISANO,
Appellant (Plaintiff),**

v.

**Gabe GASTON, Appellee (Defendant).**

No. S–10–0138.

Supreme Court of Wyoming.

Jan. 20, 2011.

---

5. The Physician's Certification clearly states that it is not a prescription for marijuana.

Representing Appellant: C. John Cotton of Cotton Law Office, P.C., Gillette, Wyoming.

Representing Appellee: Rebecca A. Lewis of Pence and MacMillan LLC, Laramie, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] This is an appeal from a summary judgment granted to the defendant in a worker's compensation co-employee liability suit. We affirm because there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law.

## ISSUE

[¶ 2] When viewed in the light most favorable to the appellant (Formisano), would the undisputed facts of this case allow a reasonable jury to find that the appellee (Gaston) intentionally acted to cause physical harm or injury to Formisano, as that concept is defined under Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2009)?

## STANDARD OF REVIEW

[¶ 3] Motions for summary judgment come before the trial court pursuant to W.R.C.P. 56(c) which provides that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We review the granting of summary judgment under the following standard:

On appeal, this Court evaluates the propriety of a district court's summary judgment ruling by examining the same materials and following the same standards as the district court. We examine the record de novo in the light most favorable to the party opposing the motion, giving that party the benefit of all favorable inferences which may be fairly drawn from the rec-

ord. If upon review of the record, doubt exists about the presence of genuine issues of material fact, we resolve that doubt against the party seeking summary judgment. We review questions of law de novo without giving any deference to the district court's determinations. If we can uphold summary judgment on any proper legal basis appearing in the record, we will.

*Heimer v. Antelope Valley Improvement,* 2010 WY 29, ¶ 14, 226 P.3d 860, 863 (Wyo. 2010) (quoting *Wagner v. Reuter,* 2009 WY 75, ¶ 11, 208 P.3d 1317, 1321–22 (Wyo.2009)) (internal citations omitted).

[¶ 4] "The party moving for summary judgment has the burden of demonstrating that no genuine issues of material fact exist and that [it] is entitled to summary judgment as a matter of law." *Stephenson v. Pacific Power & Light Co.,* 779 P.2d 1169, 1171 (Wyo.1989). A material fact is a fact that "if proved, would have the effect of establishing or refuting an essential element of the claim or defense asserted by the parties." *Id.* If the party seeking summary judgment meets his or her "initial burden of establishing a *prima facie* case for summary judgment[,] 'the party who is opposing the motion for summary judgment must present specific facts to demonstrate that a genuine issue of material fact exists.'" *Hatton v. Energy Elec. Co.,* 2006 WY 151, ¶ 9, 148 P.3d 8, 12 (Wyo.2006).

"After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact. The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings ..., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden."

The evidence opposing a prima facie case on a motion for summary judgment "must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceed-

ing to trial on the basis of mere conjecture or wishful speculation." Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact.

*Id.* at ¶ 9, at 12–13 (quoting *Cook v. Shoshone First Bank,* 2006 WY 13, ¶ 12, 126 P.3d 886, 890 (Wyo.2006)).

[¶ 5] Statutory interpretation is a question of law that we review *de novo,* without affording deference to the district court's determination. *State ex rel. Wyo. Dep't of Revenue v. Hanover Compression, LP,* 2008 WY 138, ¶ 8, 196 P.3d 781, 784 (Wyo.2008); *Union Pac. Res. Co. v. Dolenc,* 2004 WY 36, ¶ 13, 86 P.3d 1287, 1291 (Wyo. 2004).

### WYO. STAT. ANN. § 27–14–104(a) (LEXISNEXIS 2009)

[¶ 6] The statutory language at issue in this case is found in Wyo. Stat. Ann. § 27–14–104(a), which is part of the Wyoming Worker's Compensation Act:

(a) The rights and remedies provided in this act for an employee including any joint employee, and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer and any joint employer making contributions required by this act, or their employees acting within the scope of their employment *unless the employees intentionally act to cause physical harm or injury to the injured employee,* but do not supersede any rights and remedies available to an employee and his dependents against any other person.

(Emphasis added.)

### FACTS

[¶ 7] At the time of the accident giving rise to this lawsuit, Formisano and Gaston were both employed by Western Mine Services, Inc. (Western). They lived in Gillette, Wyoming. Formisano, originally from Italy, had limited English language skills. He had been in America since 1993, but had worked for Western for less than a year. Gaston, on the other hand, although younger than Formisano, was a native of Gillette and had worked for Western for about two years.

[¶ 8] Formisano and Gaston were on the same work crew, although several crew members, including the crew leader, had quit, leaving the crew shorthanded. Because Gaston had more job tenure than did Formisano, Gaston took on some of the crew leader's duties. Gaston drove the crew's work truck, he had the company credit card to purchase gas, and he communicated for the crew with company supervisors and work-site supervisors.

[¶ 9] On January 26, 2005, Formisano and Gaston were sent to the North Antelope Mine south of Gillette to work on a truck bed needing repairs. Gaston got up between 4:00 and 4:30 a.m. in order to be at the company shop at 5:00 a.m. Gaston and Formisano left the shop at about 5:00 a.m., with Gaston driving the company truck. Gaston stopped to fuel the vehicle, using a company credit card, and then drove to the mine, arriving at about 7:00 a.m.

[¶ 10] When the two men arrived at the mine, Gaston went into the shop, located the mine supervisor, and discussed with him the work that needed to be done. Gaston then returned to the company truck, where he and Formisano waited for the mine truck, which was in a wash bay. They did not begin working on the truck bed until about noon.

[¶ 11] Around 4:00 p.m., Gaston left Formisano working on the truck bed and went to call Western for further work instructions. It was normal procedure to "call in" at about that time each day to find out the next day's assignment. Formisano testified in his deposition that Gaston reported after the call that they needed to finish the truck bed repair, no matter how long it took, and that they both had to report to work at 5:00 a.m. the next day. A Western employee testified, to the contrary, that Gaston said during the telephone call that Western need not send out a night shift crew to finish the truck bed because the work would be done by the 7:00 p.m. shift change, or shortly thereafter.[1]

---

1. When working at Western's own shop, employees worked 10–hour shifts, but when working at

a mine, they generally worked 12–hour shifts, 7:00 a.m. to 7:00 p.m., with travel time added to

[¶ 12]   Formisano and Gaston finished the repair work and headed back to Gillette at about midnight with Gaston driving. Formisano testified that they both were "pretty tired," that Gaston looked "pretty white," that Formisano told Gaston he did not look well, but that Gaston replied "I'm okay." At about 1:00 a.m., Gaston fell asleep, and the vehicle drifted off the roadway, rolling one-and-a-half times after Gaston "overcorrected." Gaston later told Western personnel that he began "nodding off," so he opened the window to help himself stay awake, but that he fell asleep and "went into the ditch." Formisano suffered several herniated discs in the accident.

[¶ 13]   In the week before the accident, Gaston was off work on January 20, worked 12 hours on January 21, worked 12 hours on January 22, was off work on January 23, worked 15 hours on January 24, and worked 14 hours on January 25, for a total of 53 hours. By comparison, Formisano worked 12 hours on January 20, 12 hours on January 21, was off work on January 22, was off work on January 23, worked 12 hours on January 24, and worked 12 hours on January 25, for a total of 48 hours. Both men were "on the clock" from 7:00 a.m. on January 26 until the accident at 1:00 a.m. on January 27, which is 18 hours, but neither apparently actually worked between about 7:00 a.m. and noon.

[¶ 14]   Several Western employees were deposed, all of whom testified that Gaston violated company policy by driving when he was too tired to do so safely. They also testified that Gaston could have called in for night shift replacements at 7:00 p.m., or, after the job was finished, he could have called in to have someone drive them to Gillette, or he could have obtained permission to stay in a motel in Wright, near the mine.

## DISCUSSION

[¶ 15]   To place this case in its appropriate legal context, we will reiterate a bit of legal history. To begin, we note the well-known proposition that the "rights and remedies" of the Wyoming Worker's Compensation Act are "in lieu of" any other rights and remedies a covered employee injured "on the job" may have against his or her employer. Wyo. Stat. Ann. § 27-14-104(a). That immunity extends to co-employees who may have acted to cause the harm, so long as such co-employees did not "intentionally act to cause physical harm or injury to the injured employee...." *Id.* At its most basic level, the statute says that one employee is not liable to another if the former is only negligent.

> There are four elements to a negligence cause of action: (1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the defendant's breach of the duty of care proximately caused injury to the plaintiff; and (4) the injury sustained by the plaintiff is compensable by money damages.

*Frost v. Allred,* 2006 WY 155, ¶ 8, 148 P.3d 17, 19 (Wyo.2006) (quoting *Downtown Auto Parts, Inc. v. Toner,* 2004 WY 67, ¶ 8, 91 P.3d 917, 919 (Wyo.2004)).

[¶ 16]   This definition tells us when a co-employee is not liable—he is not liable if he is merely negligent. The trouble this Court has repeatedly faced over the years has been trying to draw the line—somewhere beyond negligence—that results in liability.[2] In *Bertagnolli v. Louderback,* 2003 WY 50, ¶ 15, 67 P.3d 627, 632 (Wyo.2003), we relied upon *dicta* from *Harbel v. Wintermute,* 883 P.2d 359, 363 (Wyo.1994), to equate the current phrase "intentionally act to cause physical harm or injury" with the phrase "willful and wanton misconduct":

> This discussion implies that the amended standard of "intentionally act to cause physical harm or injury" equates to willful and wanton misconduct. We continue to believe the concept of willful and wanton misconduct has essentially the same legal

---

that. It was not unusual for a job at a mine to go an hour or two beyond shift change.

**2.** Over the years, the legislature has described this civil *mens rea* alternatively as "gross negligence," "culpable negligence," and now "intentionally act to cause physical harm or injury." *See Bertagnolli v. Louderback,* 2003 WY 50, ¶¶ 12-15, 67 P.3d 627, 631-33 (Wyo.2003).

effect as the statutory language "intentionally act to cause physical harm or injury." Well before the 1993 amendment to § 27–14–104(a), this court expressly defined willful and wanton misconduct in terms of intentional actions:

Willful and wanton misconduct is the *intentional* doing of an act, or an *intentional* failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.

*Weaver v. Mitchell*, 715 P.2d 1361, 1370 (Wyo.1986) (emphasis added); *see also Mayflower Restaurant Company v. Griego*, 741 P.2d 1106, 1115 (Wyo.1987).

[¶ 17] In *Bertagnolli*, we went on to describe the key factors in finding co-employee liability under § 27–14–104(a) are a co-employee with (1) knowledge of the hazard or serious nature of the risk involved, (2) responsibility for the injured employee's safety and work conditions, and (3) willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result.

2003 WY 50, ¶ 16, 67 P.3d at 633 n.2. We then cited *Smith v. Throckmartin*, 893 P.2d 712 (Wyo.1995), as requiring that "the co-employee's actions must be willful and not merely inadvertent in nature." *Bertagnolli*, 2003 WY 50, ¶ 17, 67 P.3d at 633. A plaintiff must prove that a defendant "acted with a state of mind approaching intent to do harm or committed an act of an unreasonable character in disregard of known or obvious risks so great as to make it highly probable that harm would follow." *Id.* at ¶ 17, at 633 (citing *Smith*, 893 P.2d at 714).

[¶ 18] In *Bertagnolli*, we reversed a summary judgment that had been awarded to the defendant co-employee supervisors because the district court failed to address the evidence that created genuine issues of material fact as to the supervisors' knowledge of the general risks involved in the employee's work. 2003 WY 50, ¶ 26, 67 P.3d at 635. Five years later, in *Hannifan v. American National Bank of Cheyenne*, 2008 WY 65,

¶ 42, 185 P.3d 679, 695 (Wyo.2008), we relied upon *Bertagnolli* in affirming a jury verdict in favor of a co-employee plaintiff, finding that the instructions adequately instructed the jury on the law as to Wyo. Stat. Ann. § 27–14–104(a). While recognizing *Bertagnolli*'s declaration that the phrase "acted intentionally to cause physical harm or injury" has the same legal effect as "willful and wanton misconduct," and while concluding that the instructions as given adequately made that point, we suggested that a clearer instruction in that regard would aid the jury:

A more simple and direct approach to the instructions could have been more helpful to the jury in considering these complex issues. We would suggest that district courts and litigants in the future consider one instruction such as:

A co-employee is liable to another co-employee if the employee acts intentionally to cause physical harm or injury. To act intentionally to cause physical injury is to act with willful and wanton misconduct. Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, in a high degree of probability, result in harm to another. In the context of co-employee liability, willful and wanton misconduct requires the co-employee to have 1) actual knowledge of the hazard or serious nature of the risk involved; 2) direct responsibility for the injured employee's safety and work conditions; and 3) willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result.

*Id.* at ¶ 34 n.2, 185 P.3d at 692 n.2. We continue to endorse such an instruction.

[¶ 19] In our most recent foray into this arena, we affirmed a summary judgment granted to a co-employee supervisory defendant where the plaintiff was injured in a mining accident. *Loredo v. Solvay Am., Inc.*, 2009 WY 93, ¶¶ 16–18, 212 P.3d 614, 626–29 (Wyo.2009). In affirming the summary judg-

ment, we quoted at length from the district court's decision letter, which relied heavily upon *Bertagnolli*, and which also made the necessary distinction between simple negligence and the "state of mind that approaches intent to do harm" required by the statute. *Id.* at ¶ 17, 212 P.3d at 627–28; *see also McKennan v. Newman*, 902 P.2d 1285, 1287–88 (Wyo.1995) (co-employee's violation of company safety policies and OSHA regulations showed only ordinary negligence); *Smith*, 893 P.2d at 714 (aggravating factor that elevates ordinary negligence to willful and wanton misconduct is "state of mind that approaches intent to do harm"); and *Cockburn v. Terra Res., Inc.*, 794 P.2d 1334, 1344 (Wyo.1990) (supervisor's knowledge of hazardous condition, coupled with failure to correct it, shows ordinary negligence, but not culpable negligence (decided under old statute)). In concluding in *Loredo* that the defendant did not act "willfully, wantonly, or intentionally," we quoted the following from the district court's decision letter:

> Willful misconduct does not arise merely from "a thoughtless, heedless or inadvertent act, or an error in judgment," it is "more than mere mistake resulting from inexperience, excitement or confusion … or simple inattention," but it is "an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Smith*, 893 P.2d at 714 (citations and quotations omitted).

*Loredo*, 2009 WY 93, ¶ 17, 212 P.3d at 627–28.

[¶ 20] The district court issued a three-page decision letter in this case in which it analyzed *Bertagnolli* and *Hannifan*, and then granted summary judgment to Gaston on the following basis:

> The court finds that, even assuming all of the facts are as Plaintiff alleges, Defendant is entitled to summary judgment because the standard under the Worker's Compensation statutes requires conduct beyond what occurred here. Driving while tired is simply not the kind of conduct envisioned in the exception to the statutory grant of immunity from liability of the Worker's Compensation provisions. Logic would indicate that Mr. Gaston would not

have placed himself in the vehicle with Mr. Formisano and driven if he had known, with a "high degree of probability," that harm would result. There is no genuine issue of material fact that would permit a jury to find that Defendant's conduct was of a type "approaching intent to do harm."

[¶ 21] Perhaps realizing that "falling asleep at the wheel," on its face, simply does not reach the high standard of misconduct required for co-employee liability under the statute, Formisano broadens his accusations in two particulars. First, he describes several events during the work day prior to the accident in which Gaston treated Formisano rudely, or Gaston allegedly was untruthful while speaking with Formisano or Western supervisors. Formisano speculates that Gaston purposefully misled the supervisors so that he could work late to obtain overtime pay.

[¶ 22] Formisano's second appellate theme is that Gaston did not just fall asleep while driving; rather, Gaston intentionally drove while "sleep deprived." In support of his theory that driving while sleep deprived is misconduct that "approaches intent to do harm," Formisano relies upon four cases. In *Cummings v. ConGlobal Indus.*, 2008 WL 4613817, at *1, 2008 U.S. Dist. LEXIS 81967, at *2–3 (N.D.Okla. Oct. 14, 2008), an unreported case, the trial court denied summary judgment to a driver's employer on the issue of punitive damages where the allegations were that the driver: (1) was sleep-deprived, having slept only five-and-a-half hours in three days; (2) was speeding; (3) was recently cited for other traffic violations; (4) had "doctored" his driver's log to show compliance with sleep regulations; and (5) was transporting an unauthorized passenger.

[¶ 23] The next case cited by Formisano is *Meus v. State of Florida*, 968 So.2d 706 (Fla.Dist.Ct.App.2d Dist.2007), a vehicular homicide case apparently based upon sleep deprivation, where the court remanded for an evidentiary hearing on the issue of ineffective assistance of counsel. The evidence was that Meus had been driving for almost ten hours in a twenty-four hour period. *Id.* at 709. The underlying issue was counsel's alleged failure to interview and call as a witness a

"first responder" who was of the opinion that the crash was not caused by Meus having fallen asleep. *Id.* at 711.

[¶ 24] In *DeMatteo v. Simon*, 112 N.M. 112, 812 P.2d 361 (N.M.Ct.App.1991), the Court of Appeals of New Mexico upheld a jury award of punitive damages under the following circumstances:

> Evidence that DeMatteo drove three to four hours the day before the accident, slept about five hours in his car, remained awake for the next twenty hours immediately prior to the accident, and then consumed marijuana shortly before the accident allowed the jury to conclude that punitive damages were warranted because DeMatteo displayed an utter indifference for the safety of others when he decided to drive.

*Id.* at 364.

[¶ 25] Finally, Formisano relies upon *Glover v. TransCor America, Inc.*, 57 F.Supp.2d 1240 (D.Wyo.1999), where the district court denied summary judgment to a driver's employer on the theories of negligent supervision and punitive damages. Significantly, however, these causes of action were allowed to survive *against the company* because of its policy that allowed drivers to be in the vehicle for up to 24 hours with only short breaks, and because of its deliberate decision not to equip its prisoner-transport van with seat belts. *Id.* at 1249. As to the driver, the court came to this contrary conclusion:

> The court finds that there is no basis for the imposition of punitive damages against defendant based on the acts of its employee Mr. Dufer. It is undisputed that the van was not equipped with seat belts and therefore it was not Mr. Dufer's actions or inactions that resulted in plaintiff not wearing a seat belt. Plaintiff alleges that Mr. Dufer was negligent in falling asleep. Under these circumstances, punitive damages are not appropriate for the imposition of punitive damages based upon Mr. Dufer's alleged actions. *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106, 1115 (Wyo.1987) ("Punitive damages are not appropriate in circumstances involving inat-

tention, inadvertence, thoughtlessness, mistake, or even gross negligence.").

*Id.* at 1250 (some citations omitted).

[¶ 26] Applying these principles to the facts of the present case, we are convinced that the district court got it right. Being tired, but "feeling okay," Gaston got in the driver's seat after a long day's work, intending to drive home to Gillette, less than two hours away. Even assuming that some of the late hours of work could have been avoided by Gaston, we do not see this conduct as meeting the test for co-employee liability under the Wyoming Worker's Compensation Act. While there certainly was some possibility of Gaston falling asleep and causing an accident, we cannot say that Gaston intentionally acted to cause physical harm to Formisano, or that these circumstances were such "that a reasonable person would know, or have reason to know, that such conduct would, in a high degree of probability, result in harm to another."

[¶ 27] A good portion of Formisano's effort in the district court, and in this Court, was directed at presenting Gaston as a "bad guy" who treated Formisano poorly. Formisano also went to great lengths to show that Gaston was, in effect, Formisano's supervisor. Assuming that both assertions are true does not change the resolution of this case. There is no causal relationship between Gaston's attitude toward Formisano during the day and the accident in the middle of the night. Also, Gaston admits that, as driver of the vehicle, he owed Formisano a duty of due care, whether or not he was Formisano's supervisor.

## CONCLUSION

[¶ 28] There are no genuine issues of material fact and Gaston is entitled to judgment as a matter of law. Gaston's admitted negligence in falling asleep while driving simply does not rise to the level of misconduct envisioned by the exception to immunity in the Wyoming Worker's Compensation Act.

[¶ 29] Affirmed.