2011 WY 98

**Michael J. VAN PATTEN,**
**Appellant (Plaintiff),**

v.

**Corby GIPSON, John Sharisky, and Mike**
**Wixom, Appellees (Defendants).**

No. S–10–0202.

Supreme Court of Wyoming.

June 23, 2011.

Representing Appellant: S. Joseph Darrah and Christopher M. Brown of Darrah, Darrah & Brown, P.C., Powell, Wyoming. Argument by Mr. Darrah.

Representing Appellees: Jason A. Neville and Keith J. Dodson of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Dodson.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] Michael Van Patten was injured while working on a drilling rig. He filed suit against several of his co-employees, including Corby Gipson, John Sharisky and Mike Wixom, claiming their willful and wanton misconduct caused his injuries. The district court held as a matter of law that the co-employees' acts or omissions were not willful and wanton and granted their motion for summary judgment. Mr. Van Patten appeals, claiming there were genuine issues of material fact precluding summary judgment. We affirm.

## ISSUES

[¶ 2] Mr. Van Patten presents one issue for this Court's determination which we restate as follows:

Whether the district court erred in finding that the undisputed material facts demon-

strate the co-employees' acts or omissions were not willful and wanton?

The co-employees state three issues which we paraphrase as follows:

I. Whether the district court correctly held their conduct did not constitute willful and wanton misconduct.

II. Whether the district court correctly found their violations of H & P International Drilling Company's (H & P) policies did not amount to willful and wanton misconduct.

III. Whether the district court correctly held that their individual acts could not be combined to establish willful and wanton misconduct on the part of each of them.

### FACTS

[¶ 3] Mr. Van Patten worked for H & P as an entry level floorman. The co-employees also worked for H & P, Mr. Gipson as driller and direct supervisor of the rig crew, Mr. Sharisky as assistant driller and Mr. Wixom as derrickman. In May of 2007 they were all working on H & P rig 287 in Sublette County, Wyoming.

[¶ 4] On May 5, 2007, the rig manager directed Mr. Gipson and his crew to pressure wash the derrick during their shift. The crew went to the driller's cabin where they discussed the operation and filled out a job safety analysis and personnel hoisting pre-job checklist for washing the derrick. Either Mr. Sharisky or Mr. Wixom told Mr. Van Patten to put on the manrider, a harness

worn around the torso with a board attached to it to sit on. The manrider was used to hoist personnel when work needed to be performed on the derrick above the rig floor, in this case washing the derrick. The manrider was hooked to a cable, the tugger line, which ran from a hydraulic hoist located on the rig floor up through the derrickboard to the top of the derrick and back down. One crew member operated a hydraulic hoist to turn the tugger line and raise another crew member wearing the manrider into the air.

[¶ 5] At some point after Mr. Van Patten was in the manrider but still on the rig floor, the crew realized the tugger line had been pulled back out of the way by members of an earlier crew and locked with a mechanism called a storm gate located on the bottom of the derrickboard so that they could rack pipe without getting tangled in the tugger line. Unless the tugger line was freed, Mr. Van Patten could not reach parts of the derrick with the pressure washer.[1] It was decided to raise Mr. Van Patten in the manrider up under the derrickboard to open the storm gate and release the tugger line. At the time, no one filled out a job safety analysis or personnel hoisting pre-job checklist for using the manrider to open the storm gate and free the tugger line.

[¶ 6] Mr. Wixom operated the hoist to lift Mr. Van Patten up beneath the derrickboard. Mr. Wixom lost sight of Mr. Van Patten and asked Mr. Sharisky to spot for him. As Mr.

---

1. The testimony differed as to when the crew realized the tugger line was behind the storm gate and would have to be released in order to reach parts of the derrick with the pressure washer. An H & P memorandum written after the fact stated the rig manager told the crew at the 5:30 p.m. meeting on May 5, 2007, that a man would have to go up the derrick ladder to open the storm gate and release the tugger line. No one on the crew, including Mr. Van Patten, remembered the statement.

Mr. Van Patten testified that before he went up in the manrider, Mr. Gipson decided he wanted him to start washing the derrick in the area of the draw works. Mr. Van Patten testified that decision caused the scope of the operation to change from simply lifting him with the tugger line to wash the derrick, to lifting him initially up to the derrickboard to free the tugger line. According to Mr. Van Patten, he was only lifted once and that is when he was injured.

In contrast, Mr. Wixom testified that he helped Mr. Van Patten into the manrider, gave him the pressure washer and hoisted him up the tugger line to begin washing the derrick. He testified that about forty to fifty feet up, Mr. Van Patten signaled for him to stop and bring him down. Mr. Wixom testified that when Mr. Van Patten was down they discussed the need for someone to go to the derrickboard and release the tugger line. He testified they discussed how to best accomplish that and decided to lift Mr. Van Patten in the manrider and have him release the tugger line. Several other witnesses also testified that they saw Mr. Van Patten going up the tugger line and coming immediately back down before he was injured. The conflicting evidence concerning when the crew realized the tugger line was behind the storm gate does not affect our resolution of the question of whether a factual issue existed on the claim that the co-employees' actions were willful and wanton.

Van Patten was attempting to open the storm gate to release the cable, Mr. Sharisky thought he saw him give the signal to be raised up. Mr. Sharisky signaled to Mr. Wixom to hoist Mr. Van Patten up. As Mr. Wixom did so, Mr. Van Patten was pulled into the derrickboard and sustained a compression fracture in his thoracic spine. After the incident, Mr. Gipson filled out the personnel hoisting checklist for the task of unlocking the storm gate and freeing the tugger line.

[¶ 7] H & P investigated the accident and concluded the crew, and specifically the driller, Mr. Gipson, violated company procedure by allowing Mr. Van Patten to be lifted to the derrickboard to open the storm gate and free the tugger line without filling out a personnel hoisting pre-job checklist. H & P docked Mr. Gipson's pay $1.00 per hour for a two week period. No action was taken against any other employees involved in the incident.

[¶ 8] Mr. Van Patten filed a complaint alleging his co-employees [2] acted recklessly, willfully and wantonly in various ways, including failing to perform a job safety analysis or obtain a permit before hoisting him in the manrider to release the tugger line, failing to instruct him on proper procedure for opening the storm gate, using the manrider instead of the ladder to ascend the derrick and open the storm gate, and operating the hydraulic hoist when he was under the derrickboard. The co-employees answered the complaint and the parties proceeded with discovery. The co-employees then filed a motion for summary judgment alleging there were no genuine issues of material fact supporting the claim that they acted willfully and wantonly and they were entitled to judgment as a matter of law. The district court convened a hearing and, after considering the parties' respective positions, granted the co-employees' motion. Mr. Van Patten timely appealed.

## STANDARD OF REVIEW

[¶ 9] When reviewing an order granting summary judgment, we consider the record *de novo*. *M & M Auto Outlet v. Hill Inv. Corp.*, 2010 WY 56, ¶ 11, 230 P.3d 1099, 1104 (Wyo.2010). Our duty is identical to that of the district court, we review the same material and we follow the same standards. *Id.* Summary judgment is appropriate if there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *Id.* We consider the record in the light most favorable to the party opposing the motion, giving that party all favorable inferences that can be drawn from the facts contained in the affidavits, depositions and other material properly appearing in the record. *Id.*

## DISCUSSION

[¶ 10] The rights and remedies set forth in the Wyoming Worker's Compensation Act for an employee injured in the course of his or her employment are in lieu of other remedies against the employer and co-employees, "unless the employees intentionally act to cause physical harm or injury to the injured employee." Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2009). This Court has equated the phrase "intentionally act to cause physical harm or injury" to the concept of "willful and wanton misconduct." *Bertagnolli v. Louderback*, 2003 WY 50, ¶ 15, 67 P.3d 627, 632 (Wyo.2003). Thus, to survive the co-employees' motion, Mr. Van Patten was required to submit evidence establishing that genuine issues of material fact existed as to whether their acts or omissions were willful and wanton. To make that showing, Mr. Van Patten had to submit evidence showing the co-employees had knowledge of the dangerous condition and demonstrated a disregard of the danger through intentional acts. *Id.*, ¶ 19, 67 P.3d at 634.

[¶ 11] We applied this standard in *Bertagnolli* to conclude the evidence demonstrated the existence of factual issues precluding summary judgment. Mr. Bertagnolli worked in a trona mine in Sweetwater County. He presented evidence that his supervisor instructed him to work in the shuttle belt area of the mine while the shuttle belt was operat-

---

**2.** Mr. Van Patten named several other co-employees in his complaint. After conducting discovery, the parties stipulated to their dismissal and the district court so ordered.

ing. When he said he would not work in the area unless the belt was locked out, his supervisor told him that he could be fired if he did not do the job as instructed. Mr. Bertagnolli asked that the union steward be contacted to resolve the issue. However, while waiting for the union steward, he began the work he had been told to do because he believed he would be fired otherwise. As he was working, the rail car started to travel back toward him, the cable beneath his feet began to move, he tripped, and his right foot caught in the pinch point between a steel cable and sheave wheel, severing the back of his foot. We reversed the order granting summary judgment, finding that the evidence Mr. Bertagnolli presented raised genuine issues of material fact as to his supervisors' knowledge of the dangers of working in the shuttle belt area while it was operating and whether they intentionally disregarded those dangers when they required Mr. Bertagnolli to work in the area without locking out the belt.

[¶ 12] In *Hannifan v. American Nat'l Bank of Cheyenne,* 2008 WY 65, 185 P.3d 679 (Wyo.2008), we applied the *Bertagnolli* standard to uphold a jury verdict finding the acts and omissions of two co-employee supervisors to be willful and wanton. Leslie Butts was operating a large piece of machinery in a narrow boxcut on the floor of an open pit mine when a rock fell from a high side wall and landed on top of the machinery, leaving him a paraplegic. His supervisors claimed it was an extremely unusual event and that the rock shot out of the wall fifty-three feet into the center of the pit without ever hitting any of the catch benches intended to catch rubble that sloughed off the walls. Mr. Butts presented evidence that an official report indicated the pit was "scary" earlier in the day, other employees had told the supervisors they would not work in the area, and earlier sloughs had hit machinery in the middle of the pit and blocked traffic. He also presented evidence that the catch benches were full and, therefore, ineffective in guarding against the danger of sloughs; unlike every other area of the mine, there were no catch benches on the high walls above the boxcut; the machinery he was operating did not have required equipment that would have protect-

ed him; the boxcut was narrower, the high walls were steeper and the catch benches were not in compliance with the mine control plan; although other employees expressed concern to the supervisors about the dangerous condition of the pit, the supervisors decided against closing the area down; and the injury of another employee in an earlier slough incident provided warning of problems with the high walls but no action was taken to address the problems.

[¶ 13] In *Loredo v. Solvay America, Inc.,* 2009 WY 93, 212 P.3d 614 (Wyo.2009), we upheld a district court's order granting summary judgment for a co-employee supervisor finding there were no disputed facts on the issue of whether he acted willfully and wantonly to cause the injury. Mr. Loredo was employed by a mine to drive metal bolts into the rock ceiling to prevent collapse or falling rock. His bolter became stuck and he attempted to free it by moving it backward and forward. As he worked to free the bolter, he inadvertently drove under the unbolted ceiling. A slab of rock fell and hit him, leaving him a quadriplegic. Mr. Loredo presented evidence that he expressed concern to his supervisor about his defective bolter and the supervisor advised him to go ahead and use it and they would fix it during the down shift. He claimed he raised safety concerns with his supervisor who willfully, wantonly and intentionally disregarded them. After reviewing the evidence in the light most favorable to Mr. Loredo, including evidence that his supervisor complied with the mine's roof bolting plan and assured Mr. Loredo that the roof bolter would be fixed during the down shift, we concluded the district court properly granted summary judgment.

[¶ 14] Most recently, in *Formisano v. Gaston,* 2011 WY 8, 246 P.3d 286 (Wyo.2011), we affirmed an order granting summary judgment to a co-employee, concluding there were no factual issues for a jury as to whether he intentionally acted to cause harm to the plaintiff. Mr. Formisano was injured when he and Mr. Gaston were returning from a work site late at night in a company vehicle, Mr. Gaston fell asleep at the wheel and the vehicle went off the road and into a ditch. Testimony was presented that Mr. Gaston

violated company policy by driving when he was too tired to do so safely and could have called for replacements rather than working late to finish the job, could have called to have someone drive them from the job site, or could have obtained permission to stay in a motel near the site. We stated:

> Being tired, but "feeling okay," Gaston got in the driver's seat after a long day's work, intending to drive home to Gillette, less than two hours away. Even assuming that some of the late hours of work could have been avoided by Gaston, we do not see this conduct as meeting the test for co-employee liability under the Wyoming Worker's Compensation Act. While there certainly was some possibility of Gaston falling asleep and causing an accident, we cannot say that Gaston intentionally acted to cause physical harm to Formisano, or that these circumstances were such "that a reasonable person would know, or have reason to know, that such conduct would, in a high degree of probability, result in harm to another."

*Id.,* ¶ 26, 246 P.3d at 293.

[¶ 15] With this precedent in mind, we turn to consideration of the evidence presented in the current case, viewing it in the light most favorable to Mr. Van Patten. Mr. Van Patten testified that he arrived at the rig at 5:30 p.m. on May 5, 2007. He attended the safety meeting where the rig manager instructed the crew members to wash the derrick during their shift. Mr. Van Patten and Mr. Gipson testified there was no discussion at the meeting about how the crew was to go about washing the derrick. Mr. Gipson testified specifically that the rig manager who conducted the meeting did not mention that the crew would have to free the tugger line from the storm gate in order to clean the derrick.

[¶ 16] Mr. Van Patten testified that he left the meeting, performed some other tasks and then Mr. Sharisky told him that Mr. Gipson wanted him to start washing the derrick. Mr. Van Patten testified that he had washed the rig before, the pressure washer was standard equipment and he was comfortable using it. He testified that either Mr. Sharisky or Mr. Wixom told him to put on the manrider. He had used the manrider a couple of times before and knew how to put it on, but he had not previously worn it when washing the rig. After he was in the manrider, Mr. Wixom attached him to the tugger line with a hook located on the front of the harness. Mr. Wixom hooked a safety line to the back of the harness and Mr. Van Patten tied the pressure washer to one of the harness straps.

[¶ 17] Mr. Van Patten testified that after he was hooked up, Mr. Gipson signaled to Mr. Wixom from the driller's cabin and said that he wanted the washing to start in the vicinity of the draw works. Mr. Van Patten testified that in order to accomplish that, they had to free the tugger line from the storm gate where the earlier crew had placed it while they racked pipe. Mr. Van Patten had not previously worked in the derrickboard area nor had he opened or closed a storm gate. He testified that he asked Mr. Sharisky and perhaps Mr. Wixom whether they needed to do a second job safety analysis and get a manrider permit.[3] They responded that the rig was not in operation, nothing was running, they needed to get the rig cleaned and they would fill out the forms later. Mr. Van Patten testified that Mr. Sharisky and Mr. Wixom seemed comfortable going ahead with having him free the tugger line without a job safety analysis and permit and so he was comfortable, too; he did not feel unsafe. He testified that if he had been concerned about the safety of what he was instructed to do, he would have said so.

[¶ 18] Mr. Van Patten testified that he untied the pressure washer and left it on the rig floor. He said Mr. Wixom unhooked the safety harness and ran him up the tugger line to underneath the derrickboard to open the storm gate and free the tugger line. When Mr. Van Patten was up as far as he could go under the derrickboard, he signaled

---

**3.** It is not clear what Mr. Van Patten meant by a manrider "permit." We presume he meant the personnel hoisting pre-job checklist.

for Mr. Wixom to stop. He tried to open the storm gate but could not get it loose. The next thing he knew, he was being raised up again. His head hit the derrickboard, knocking his hard hat off. As the hoist continued to pull him upward, his body was smashed against the derrickboard. He yelled and Mr. Wixom stopped the hoist. Mr. Van Patten then felt himself being lowered down to the rig floor. He testified that he asked Mr. Wixom and Mr. Sharisky what happened and Mr. Sharisky said he thought he saw Mr. Van Patten signaling to be raised up. Mr. Van Patten testified he told them he had not signaled; he was trying to get the storm gate open.

[¶ 19] Mr. Gipson was in the driller's cabin when Mr. Wixom hoisted Mr. Van Patten up to the derrickboard to release the tugger line. He testified that he did not see Mr. Van Patten hit the derrickboard; he only saw Mr. Sharisky running and a hard hat falling. Mr. Sharisky testified that he had asked Mr. Wixom to fill in for him at the hoist while he went to the bathroom and had not returned to the rig floor when the decision was made to use the manrider to free the tugger line or when Mr. Wixom began hoisting Mr. Van Patten up to the derrickboard.

[¶ 20] Mr. Sharisky and Mr. Wixom testified that Mr. Sharisky was in the driller's cabin when Mr. Wixom indicated he needed a spotter. Mr. Sharisky testified he went to assist and saw Mr. Van Patten up near the derrickboard. He testified that he told Mr. Wixom to stop the hoist. He saw Mr. Van Patten raise and lower the storm gate with his left hand while holding onto the tugger line with his right hand. He then saw him grab the tugger line with his left hand and raise his right hand to signal "up." Mr. Sharisky signaled Mr. Wixom to raise him up easy. Within seconds, he saw Mr. Van Patten's hard hat fall off, and told Mr. Wixom to lower him to the floor.

[¶ 21] Mr. Wixom's testimony was similar to Mr. Sharisky's except that he thought he remembered Mr. Sharisky being part of the discussion about using the manrider to lift Mr. Van Patten to free the tugger line. Mr. Wixom testified that he thought Mr. Shari-

sky returned to the driller's cabin after that discussion and then came back to the rig floor when Mr. Wixom needed a spotter. He testified Mr. Sharisky came back up on the floor and signaled him to raise Mr. Van Pattern up slow and easy. Mr. Wixom testified the hard hat fell and Mr. Sharisky told him to stop and bring Mr. Van Patten down.

[¶ 22] Mr. Van Patten testified he had no reason to believe his co-employees acted intentionally when they caused him to be raised and smashed into the derrickboard. He said he had no evidence that they intentionally sent him up the tugger line in the manrider thinking that he would get hurt. However, he testified that Mr. Gipson, Mr. Sharisky and Mr. Wixom failed to properly plan the operation after it was decided to hoist him up to free the tugger line in the manrider. Mr. Van Patten testified that they did not complete the required forms before sending him up to release the tugger line because they were in a hurry.

[¶ 23] As driller, Mr. Gipson was responsible for determining whether or not the manrider should be used. He testified he believed the manrider was the safest, easiest way to release the tugger line. He said he would not have allowed it if he had felt it was unsafe. He also testified it was routine for someone to ride up on the tugger line in the manrider to open a storm gate. He testified he did not know until H & P docked his pay after Mr. Van Patten was injured that he had violated company policy by not using the alternative means of sending someone up the derrick ladder to release the tugger line from the top of the derrickboard. Mr. Gipson acknowledged that job safety analyses and job checklists were to be filled out before a job commenced. He also acknowledged the H & P policy stating that hoisting a crew member with a manrider was to be done only when there was no other less hazardous means to accomplish the task.

[¶ 24] Mr. Sharisky testified that when he came onto the rig floor and saw Mr. Van Patten in the manrider below the derrickboard his first thought was that Mr. Van Patten would not be able to release the tugger line while in the manrider because it was hooked to the same line he was trying to

release. Even so, Mr. Sharisky testified he did not stop the operation because he thought he saw Mr. Van Patten performing the task. He testified he would have stopped it if he had thought it was unsafe. He also testified that Mr. Van Patten could have signaled to be brought down at any point and was obligated to do so if he felt it was not safe. Mr. Sharisky testified that it was his job to fill out the pre-job checklist for using the manrider and in order to do that he would have had to inspect and possibly should have seen that the tugger line was behind the storm gate. Mr. Sharisky acknowledged that the ladder could have been used to get a man to the derrickboard to release the tugger line.

[¶ 25] Mr. Wixom testified that although he ended up operating the tugger line hoist in Mr. Sharisky's absence, he was working that night as floorhand just like Mr. Van Patten and had no supervisory authority over him. Mr. Wixom also testified he had removed the tugger line from the storm gate in a manrider two or three times himself before Mr. Van Patten's injury. He testified he did not recall anyone on the night Mr. Van Patten was injured expressing a safety concern about using the manrider to free the tugger line. He testified that if anyone had expressed concern they would have found an alternative means of performing the operation. He also testified that in his experience job safety analyses were sometimes discussed before a task was performed and written up later.

[¶ 26] H & P conceded that a written job safety analysis and pre-job checklist for personnel hoisting were not completed at the time the operation was modified from using the manrider to hoist Mr. Van Patten simply to wash the derrick, to using it to hoist him to open the storm gate. In its report concerning the decision to dock Mr. Gipson's pay, H & P stated that he had agreed the incident "that occurred because of failing to fill out the checklist was his fault as a result of his poor planning." Also, in a post-investigation memo, H & P listed the following lessons learned from the incident:

(1) Never use the rig floor hoist as a means of transportation to a stationary area up in the derrick, such as the derrickboard;

(2) Utilize fixed ladders, portable ladders and stairs where available to access work stations and equipment in the mast;

(3) conduct manriding operations only as a last resort when no other means of egress into the mast is available;

(4) Reminder: Per H & P's written personnel hoisting/manriding procedure Rig Managers are the designated supervisor for all non-routine manriding operations. Non-routine manriding operations require[ ] the Rig Manager's written approval on the personnel hoisting checklist. Opening a storm gate is a non-routine task.

(5) When the job scope changes, (i.e. from pressure washing the lower section of the mast to opening the storm gate at the derrickboard), assess the hazards associated with the new task before starting the new task.

[¶ 27] Viewing this evidence in the light most favorable to Mr. Van Patten, we conclude no genuine issues of material fact existed and the co-employees were entitled to judgment as a matter of law on the claim that they acted willfully and wantonly. No evidence was presented showing that any of the co-employees intentionally acted to cause Mr. Van Patten physical harm. Nor was evidence presented showing that they had knowledge of, and intentionally disregarded, the danger associated with using the manrider to open the storm gate.

[¶ 28] As reflected above, Mr. Van Patten testified that he had no evidence and no reason to believe that in using the manrider to open the storm gate his co-employees acted intentionally to harm him or with knowledge of the danger. Mr. Gipson testified that he believed the manrider was the safest way to release the tugger line and would not have allowed it if he had felt it was unsafe. He also testified use of the manrider to open the storm gate was routine and he did not know until after Mr. Van Patten was injured that it violated company policy.

[¶ 29] Mr. Sharisky similarly testified that if he had thought using the manrider to

open the storm gate was unsafe, he would have stopped it. Mr. Wixom testified that if anyone had voiced a concern that what they were doing was unsafe, the crew would have found an alternative means to unlock the storm gate. Mr. Wixom also testified that prior to Mr. Van Patten's injury he had used a manrider to remove the tugger line from the storm gate two or three times himself.

[¶ 30] This simply is not the sort of evidence this Court has found demonstrates willful and wanton misconduct. Unlike the evidence in *Bertagnolli*, there was no evidence in the present case that Mr. Van Patten said he would not use the manrider to free the tugger line, pointed out the danger of doing so or expressed concern for his safety. In contrast to *Bertagnolli*, where there was evidence that no worker was allowed to work in the shuttle belt area unless it was locked, evidence was presented in this case that other workers had used the manrider to unlock the storm gate. While there seems to be no question that H & P's written policies authorized use of the manrider only when there was no alternative, evidence was presented that it was fairly common practice to use it to open the storm gate. Even the rig manager testified that he had used a manrider to release a tugger line from a storm gate, they did it all the time, and he thought he could do it safely. Moreover, unlike the situation in *Hannifan*, where supervisors were warned about the danger by the: (1) injury of another employee; (2) refusal of other employees to work in the area; and, (3) expressions of concern to supervisors by still other employees, the co-employees here had no such warning.

[¶ 31] In support of his assertion that his co-employees acted willfully and wantonly, Mr. Van Patten relies heavily on H & P's written policies and after the fact statements by upper level H & P employees who were not present on the rig or involved in using a manrider. In light of the testimony of those who were involved, these policies and statements did not establish a genuine issue of material fact on the question of whether the co-employees knew the operation was dangerous and intentionally disregarded the

danger. We affirm the order granting summary judgment to the co-employees.