# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 79

APRIL TERM, A.D. 2020

June 19, 2020

JOSE RAMIREZ,

Appellant
(Plaintiff),

v.                                                    S-19-0219

ELVIN BROWN, BILL WARTENBEE and
BRYCE MITCHELL,

Appellees
(Defendants).

*Appeal from the District Court of Natrona County*
*The Honorable Kerri M. Johnson, Judge*

*Representing Appellant:*
> C. John Cotton, Cotton Law Office, P.C., Gillette, Wyoming.

*Representing Appellee:*
> Katharine Whitney Allen and John A. Masterson, Welborn Sullivan Meck & Tooley, P.C., Casper, Wyoming; Ryan C. Gill, Lewis Brisbois & Smith LLP, Denver, Colorado. Argument by Mr. Gill.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*BOOMGAARDEN, J., delivers the opinion of the Court; FOX, J., files a dissenting opinion, in which KAUTZ, J., joins.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    Jose Ramirez sustained serious injuries when his hand and arm became entangled in a pipe-straightening machine known as the "spin-straightener" at National Oilwell Varco's Tuboscope facility in Casper, Wyoming.  Mr. Ramirez sued his co-employee supervisors—Elvin Brown, Bill Wartenbee, and Bryce Mitchell—claiming they were liable for his injuries pursuant to Wyo. Stat. Ann. § 27-14-104(a) of the Worker's Compensation Act because they "intentionally act[ed] to cause physical harm or injury[.]" The district court granted summary judgment to the co-employee supervisors and Mr. Ramirez appealed.  We affirm in part, reverse in part, and remand for trial on Mr. Ramirez's claim against Mr. Mitchell.

## *ISSUE*

[¶2]    Did the district court err when it granted summary judgment to the co-employee supervisors?

## *FACTS*

[¶3]    National Oilwell Varco's Tuboscope facility inspected and repaired oil field tubing. Mr. Ramirez began working for Tuboscope in April 2013 and continued working there until his injury in January 2017.  During all relevant time periods, Mr. Brown was the facility's operations manager, Mr. Wartenbee was the regional Health, Safety, and Environment Representative, and Mr. Mitchell was the facility's shop foreman.

[¶4]    By January 2017, Mr. Ramirez "operated quite a few different pieces of equipment in [the] shop," including the spin-straightener.  The spin-straightener could straighten pipes up to 34 feet long and two to three inches in diameter.[1]  Two employees usually ran the machine.  The "operator" stood at the control station on one end of the machine operating levers that regulated the pipe rotation, degree of downward pressure, and block movement. The "tail hand" loaded, threaded, unthreaded, and unloaded pipe at the other end of the machine.

[¶5]    The spin-straightener had been at the facility since at least 1992.  The portion which caught Mr. Ramirez's hand and arm was unguarded; however, a rail acted as a barrier between the operator and the rotating equipment.

---

[1] To be straightened, a pipe would be placed in the machine horizontally and threaded into a "sub" (a short piece of pipe) at each end of the machine.  An electric motor rotated the pipe while a set of "blocks" (rollers) were hydraulically pressed down on the rotating pipe and forced back and forth.  The combination of the pipe turning rapidly and the pressure exerted by the rollers straightened the pipe.

[¶6]    The spin-straightener was located outside.  Though a roof covered the machine itself, it did not extend over the work area around the machine.  As a result, snow and ice would accumulate around the machine.  Tuboscope did not have a written policy regarding snow and ice removal, but employees generally shoveled the area around the machine to clear it of any snow and ice before operating the machine.

[¶7]    On the day Mr. Ramirez was injured, January 11, 2017, the spin-straightener had sat idle for several days and snow had accumulated around it.  Mr. Ramirez described the events surrounding his injury as follows:

> Robert [the forklift operator] said that there was some work to do to straighten some pipes on the machine.  Like around 4:00, I went out to turn on the machine.  He was smoking outside and also the person who was going to help me with the machine.  The person who was going to help me asked if I was ready.  I said I was going to turn on the machine, and then I was going to run to the bathroom.
>
> . . . .
>
> I was back in the bathroom.  And when I came out, he was no longer there.  And so I came around from where the pipes were.  And I got a Sharpie – chalk.  I got a chalk to be able to write with.  So, when I went to grab the chalk, then I slipped, and I almost – this whole part of my body went into the machine almost.  And then when I was trying to like catch myself, it caught my hand here and then pulled it into the machine because the pipe was spinning.
>
> When I wanted to pull it out, I felt it like pop my hand.  And after that, things went very quickly.  And then before I knew it, my whole arm had kind of been pulled into the machine before I could even like react to pull it out.
>
> . . . .
>
> I wanted to pull my arm out, but I couldn't pull it out because the only part that would respond was this part up here.  So I grabbed it from down here, and I pulled it out.  When I looked, I could see that I had it all broken in here.

Mr. Mitchell drove Mr. Ramirez to the hospital.  Mr. Ramirez sustained multiple fractures to his arm and hand.  He applied for and began receiving workers' compensation benefits.

2

[¶8]   Mr. Ramirez sued Mr. Brown, Mr. Wartenbee, and Mr. Mitchell in January 2018, claiming they were not entitled to immunity from liability under the Workers' Compensation Act because they "intentionally act[ed] to cause physical harm or injury to the injured employee[.]"  His complaint alleged the spin-straightener was dangerous because "[t]here were no guards on or over any part of the machine."  It alleged the machine's location made it even more dangerous because it was outside and only partially covered by a roof, allowing snow and ice to build up around the machine, leaving the work area slick and wet.  The complaint further alleged the co-employee supervisors received numerous complaints and requests to make the machine safer but failed to do so.  The complaint alleged Mr. Brown, Mr. Wartenbee, and Mr. Mitchell each (1) had "actual knowledge of the hazard and/or serious nature of the risk involved with the machine, and knew the machine to be the most dangerous piece of equipment at the Tuboscope shop"; (2) were supervisors with direct responsibility for his work conditions and safety; and (3) "willfully acted and/or disregarded the need to act despite awareness of the high probability that serious injury or death may result."

[¶9]   Mr. Brown, Mr. Wartenbee, and Mr. Mitchell denied the allegations and asserted they were immune from liability under the Workers' Compensation Act.  Based on evidence gathered through discovery, they moved for summary judgment, submitting: the required Rule 56.1 Statement of Undisputed Material Facts; excerpts of deposition testimony from themselves, Mr. Ramirez, and an individual with knowledge about the machine's history; and information regarding a March 2012 Occupational Safety and Health Administration (OSHA) inspection at the facility that uncovered no violations.

[¶10]  In opposition to the motion, Mr. Ramirez submitted: affidavits from former Tuboscope employees Seth Peterson, Ivan Gudino, and Richard Thomas Willden; an affidavit and supporting materials from his expert, Dennis A. Muller; additional deposition testimony; photographs of the spin-straightener; Tuboscope safety materials; documents regarding his injury; and information regarding the OSHA regulations on machine guarding.

[¶11]  The district court determined the co-employee supervisors had direct responsibility for Mr. Ramirez's work conditions and safety.  However, the court granted summary judgment in favor of Mr. Brown, Mr. Wartenbee, and Mr. Mitchell, after concluding that Mr. Ramirez failed to establish a genuine issue of material fact to rebut the co-employee supervisors' prima facie showing they had no actual knowledge of the serious risk involved and did not intentionally act to cause Mr. Ramirez's injury.  Mr. Ramirez timely appealed.

*STANDARD OF REVIEW*

[¶12]  Wyoming Rule of Civil Procedure 56(a) authorizes summary judgment when "the movant[s] show[] that there is no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law."  We review the district court's order granting

3

summary judgment to the co-employee supervisor movants de novo. *Gowdy v. Cook*, 2020 WY 3, ¶ 21, 455 P.3d 1201, 1206 (Wyo. 2020) (citations omitted).

> [W]e review a summary judgment in the same light as the district court, using the same materials and following the same standards. We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*Id.* ¶ 21, 455 P.3d at 1207 (quoting *Sullivan v. Pike and Susan Sullivan Foundation*, 2018 WY 19, ¶ 15, 412 P.3d 306, 310 (Wyo. 2018)). The immunity afforded co-employees under the Workers' Compensation Act in no way alters this standard.

[¶13] As movants, the co-employee supervisors bear "the initial burden of establishing a *prima facie* case for summary judgment . . . by showing a lack of evidence on an essential element of [Mr. Ramirez's] claim." *Id.* ¶ 22, 455 P.3d at 1207 (citations omitted). If they present a *prima facie* case, the burden shifts to Mr. Ramirez, as the opposing party, "to present materials demonstrating a genuine dispute as to a material fact for trial." *Id.* ¶ 23, 455 P.3d at 1207 (citing *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 9, 148 P.3d 8, 12–13 (Wyo. 2006)). He "must affirmatively set forth material, specific facts in opposition" to the motion. *Id.* (quoting *Jones v. Schabron*, 2005 WY 65, ¶ 10, 113 P.3d 34, 37 (Wyo. 2005)).

[¶14] "The evidence presented in a summary judgment proceeding must be admissible and competent." *Id.* (citing *Jones*, ¶ 10, 113 P.3d at 37). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." W.R.C.P. 56(c)(4). "An affidavit that states a conclusion or categorical assertion of an ultimate fact cannot be used to defeat summary judgment." *Brebaugh v. Hales*, 788 P.2d 1128, 1140 (Wyo. 1990) (citing *Greenwood v. Wierdsma*, 741 P.2d 1079, 1087 (Wyo. 1987)) (concluding the affidavit of an expert opining "the acts or omissions of the supervisory personnel constituted unreasonable conduct in disregard of a known risk that made it highly probable that harm might follow" could not create a genuine issue of material fact).

4

## *DISCUSSION*

[¶15] The Workers' Compensation Act immunizes co-employees from liability for ordinary negligence,[2] but they may be liable if they "intentionally act to cause physical harm or injury to the injured employee[.]"[3] Wyo. Stat. Ann. § 27-14-104(a) (LexisNexis 2019). This statutory standard for co-employee liability "is the equivalent of willful and wanton misconduct." *Herrera*, ¶ 18, 334 P.3d at 1230 (citing *Bertagnolli*, ¶ 15, 67 P.3d at 632).

> Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.

*Id.* (quoting *Bertagnolli*, ¶ 15, 67 P.3d at 632 (emphasis omitted)). It "involves more than unreasonable conduct; it requires the element of willfulness and, when a party fails to present a genuine issue of material fact on that element, summary judgment is properly granted." *Johnston v. Conoco, Inc.*, 758 P.2d 566, 570 (Wyo. 1988) (citation omitted).

[¶16] For his co-employee liability claims to survive summary judgment, Mr. Ramirez therefore must establish a genuine issue of material fact that Mr. Brown, Mr. Wartenbee, and Mr. Mitchell each: (1) had knowledge of the hazard or serious nature of the risk the spin-straightener presented to Mr. Ramirez, (2) were responsible for Mr. Ramirez's safety and work conditions, and (3) willfully disregarded the need to act despite their personal awareness of the high probability that serious injury or death may result from Mr. Ramirez's operation of the spin-straightener. *See Herrera*, ¶ 21, 334 P.3d at 1231; *Bertagnolli*, ¶ 16, 67 P.3d at 633. We will reverse the summary judgment order only to the extent Mr. Ramirez has presented admissible evidence to support all three requirements, as to one or more of his co-employee supervisors.

---

[2] Employers are granted immunity from suit in return for their contributions to the compensation fund. *Meyer v. Kendig*, 641 P.2d 1235, 1238 (Wyo.1982) (footnote omitted). "In return[] for relinquishing their right to common-law actions against the employers [for] work-related injuries, [employees get] speedy relief for such injuries, regardless of lack of fault on the part of the employer and without cost and delay attendant to legal action." *Herrera v. Phillipps*, 2014 WY 118, ¶ 9, 334 P.3d 1225, 1228 (Wyo. 2014) (quoting *Meyer*, 641 P.2d at 1238).

[3] "Over the years, the legislature has described this civil *mens rea* alternatively as 'gross negligence,' 'culpable negligence,' and now 'intentionally act to cause physical harm or injury.'" *Formisano v. Gaston*, 2011 WY 8, ¶ 16 n.2, 246 P.3d 286, 290 n.2 (Wyo. 2011) (citing *Bertagnolli v. Louderback*, 2003 WY 50, ¶¶ 12–15, 67 P.3d 627, 631–33 (Wyo. 2003)).

[¶17] Because, as the district court suggested, the record readily demonstrates genuine issues of material fact pertaining to each co-employee supervisor's responsibility for Mr. Ramirez's work conditions and safety, we address the second requirement first.

**A. Responsibility for the injured employee's safety and work conditions.**

[¶18] To prevail on his co-employee liability claims, Mr. Ramirez must establish a genuine issue of material fact as to whether the co-employee supervisors had responsibility for his safety and work conditions. *Herrera*, ¶ 21, 334 P.3d at 1231. Ordinarily the employer has "the duty to provide his workers with a reasonably safe place to work and with competent coworkers." *Case v. Goss*, 776 P.2d 188, 192 (Wyo. 1989) (citation omitted). "[T]he employer must exercise the care and skill that a person of ordinary prudence would observe under the circumstances in furnishing employees with reasonably safe machinery, appliances, tools, and place to work, in keeping the same in reasonably safe repair, and in employing competent and sufficient" co-workers. *Id.* (citing *Mellor v. Ten Sleep Cattle Company*, 550 P.2d 500, 503–04 (Wyo. 1976)). "The ordinary rule notwithstanding, the realities of modern industry dictate that many of the legal duties owed by the employer to his employees are in fact delegated by the employer to subordinate supervisory personnel." *Id.* (citation omitted).

[¶19] This case reflects these modern realities. Mr. Brown, Mr. Wartenbee, and Mr. Mitchell served in different corporate supervisory capacities.

[¶20] Mr. Brown had been the operations manager of the Casper Tuboscope facility since approximately 2009. He directed and inspected facility operations "to ensure maximum quality production"; "[d]irected all personnel issues"; "identif[ied], train[ed], motivate[ed], and supervis[ed] all facility personnel"; and was responsible for "maintain[ing] a high level of quality and safety awareness." He testified at his deposition that he did "[a] lot" to "maintain a high level of quality and safety awareness," including directing supervisors and "watch[ing] over that we're doing all of our inspections, the safety training material."

[¶21] Mr. Wartenbee became the Health, Safety, and Environment (HSE) Representative for the Rocky Mountain region, which included the Casper Tuboscope facility, in 2016. His broad safety responsibilities included:

- "[c]omplet[ing] monthly HSE inspection surveys and report[ing] findings to [the] Facility Manager and HSE Manager";

- "[w]ork[ing] with facility management to effectively identify and correct any safety issues that are identified in the workplace";

6

- "[p]articipat[ing] in and manag[ing] the facility Behavior Based Safety Program";[4]

- "[r]eview[ing] and creat[ing] Job Hazard Analysis when changes in the workplace require";

- "perform[ing] incident investigations to develop root causes and corrective actions for all incidents";

- "[a]ssist[ing] in all HSE related audits"; and

- "[a]ssisti[ng] facility management in the preparation and presentation of weekly safety meeting material."

He spent a couple hours at the Casper facility each week.

[¶22] Mr. Mitchell was the shop foreman. He was responsible for ensuring employees properly carried out their duties, and he reported directly to Mr. Brown. Mr. Mitchell agreed at his deposition that one of his main responsibilities was safety. To that end, he held safety meetings, he collected "dragon cards" from employees to give to Mr. Wartenbee, and employees typically reported injuries to him. Mr. Brown testified that he expected Mr. Mitchell to complete the company's "52 weeks of safety training," to ensure employees completed their Job Hazard Analysis training, and to conduct monthly facility audits. Mr. Mitchell was supervising Mr. Ramirez when he was injured.

[¶23] Viewed in the light most favorable to Mr. Ramirez, but giving no weight to Mr. Muller's conclusory opinion each of Mr. Ramirez's co-employee supervisors "had

---

[4] Mr. Wartenbee explained "the facility behavior-based safety program" as follows:

> Each employee does a card each month. They used to be called stop cards. We call them dragon cards now. It's for the employee to go out and do an observation of other areas of their choosing. They go out and they can watch -- watch what's going on at that particular job. If they notice anything that needs to be addressed, any issues, hazards, whatever, they can -- they're able to write that down on their sheet. They're looking for basically hazards, PPE, or corrections they can identify to tell the operator or something, like maybe we should try doing something this way or you shouldn't do that because you could potentially have this problem.

> The cards are then reviewed by the facility manager or supervisor. Then they come to me, and then I enter in the database what they checked off.

responsibility for [his] safety and work conditions," *see Brebaugh*, 788 P.2d at 1140, the record indicates that each bore responsibility for employee safety and work conditions. Mr. Brown and Mr. Mitchell were on site daily and had direct training and supervisory responsibility over Tuboscope employees. In addition to weekly visits to the facility, Mr. Wartenbee was responsible for reviewing and keeping records of employees' written safety complaints and for working with Mr. Brown and Mr. Mitchell to effectively correct identified safety issues. We therefore have little trouble concluding the record establishes genuine issues of material fact concerning each co-employee supervisor's responsibility for Mr. Ramirez's safety and work conditions.[5] *See Case*, 776 P.2d at 193–97 (reversing summary judgment as to certain co-employees where record evidence similarly demonstrated worker safety responsibility or direct supervision of the injured employee when the injury occurred).

### B. Knowledge of the hazard or serious nature of the risk involved.

[¶24] Mr. Ramirez also must establish a genuine issue of material fact as to whether his co-employees had knowledge of the hazard or serious nature of the risk involved. *Herrera*, ¶ 21, 334 P.3d at 1231. It is not enough for Mr. Ramirez to show his co-employee supervisors were aware of a possibility of harm. He must show his co-employee supervisors "knew there was a high probability that [Mr. Ramirez] was in danger of bodily harm." *Krier v. Safeway Stores 46, Inc.*, 943 P.2d 405, 417 (Wyo. 1997) (emphasis omitted) (affirming summary judgment in favor of store manager in the absence of "evidence that any Town and Country Safeway store employee had been threatened with harm, let alone seriously injured or killed, while opening a Cheyenne Safeway store prior to Krier's tragic confrontation.").

[¶25] We made clear in *Vandre v. Kuznia*, that knowledge of the hazard or serious nature of the risk involved must be more than just generalized knowledge of a possible risk. 2013 WY 127, ¶ 18, 310 P.3d 919, 923–94 (Wyo. 2013) (there was "no genuine issue of material fact that the co-employee supervisors knew the windrow elevator obstructed the paver operator's line-of-site" but that was insufficient because there was "no evidence

---

[5] The co-employee supervisors argue they cannot be liable for Mr. Ramirez's injury because Mr. Ramirez slipped on a natural accumulation of snow and ice. "The application of the natural accumulation rule relates to the threshold question of whether a duty exists[.]" *RB, Jr. by & through Brown v. Big Horn Cty. Sch. Dist. No. 3*, 2017 WY 13, ¶ 13, 388 P.3d 542, 547 (Wyo. 2017) (quoting *Selby v. Conquistador Apartments, Ltd.*, 990 P.2d 491, 494 (Wyo. 1999)). Even assuming this rule might apply in a co-employee liability case, an issue the district court did not reach and we have never addressed, there is a genuine issue of material fact whether the accumulation was natural or unnatural given the machine's location and the partial covering. *See id.* ¶¶ 14–16, 388 P.3d at 547 (distinguishing between a natural accumulation and an unnatural one in which "the defendant created or aggravated the hazard, . . . knew or should have known of the hazard, and . . . the hazardous condition was substantially more dangerous than it would have been in its natural state."); *Selby*, 990 P.2d at 496 ("The determination of whether the location of the dumpster in relation to the parked car aggravated the condition, or whether the accumulation of ice was simply a natural consequence of sunlight and shadow, is one of basic facts which must be determined by the trier of fact.").

demonstrating that the co-employee supervisors knew of the hazard or serious nature of the risk involved in directing Dorsey to move the paver under the circumstances"). Mr. Ramirez must establish that each co-employee supervisor knew of the serious nature of the risk or degree of danger of slipping and falling near unguarded portions of the operating spin-straightener. *Bertagnolli*, ¶ 25, 67 P.3d at 635; *c.f. Calkins v. Boydston*, 796 P.2d 452, 456 (Wyo. 1990) ("Although the Boydstons may have been generally aware of the possibility of harm from unguarded drive shafts, there is no evidence that either of them knew the degree of danger presented by the particular pump on which appellant was injured."). And he must do more than suggest his co-employee supervisors had the requisite knowledge based on evidence of safety regulation violations. *Hannifan v. Am. Nat'l Bank of Cheyenne*, 2008 WY 65, ¶ 7, 185 P.3d 679, 684 (Wyo. 2008) (citing *McKennan v. Newman*, 902 P.2d 1285, 1287–88 (Wyo. 1995); *Poulos v. HPC, Inc.*, 765 P.2d 364, 366 (Wyo. 1988)).

[¶26] The evidence of knowledge we first consider is the Job Hazard Analysis for the spin-straightener. The Tuboscope facility prepared and updated job hazard analyses for each piece of machinery, including the spin-straightener. Mr. Brown, Mr. Wartenbee, and Mr. Mitchell each were responsible for and knowledgeable of the spin-straightener Job Hazard Analysis. Most relevant here, each knew the Job Hazard Analysis identified being caught in, on or between the machine, and falls either on the same level or from an elevation, as particular dangers associated with working on the spin-straightener. With knowledge of these documented dangers, Mr. Brown, Mr. Wartenbee, and Mr. Mitchell each also knew how the machine was guarded and that snow and ice accumulated around the machine. From this evidence a jury could reasonably infer Mr. Brown, Mr. Wartenbee, and Mr. Mitchell knew that the probability and risk of serious injury associated with those dangers increased when snow and ice was present.

[¶27] A jury could also infer the co-employee supervisors had knowledge of the hazard and serious nature of the risk involved from evidence Mr. Ramirez and others complained about the area around the machine being uncovered and exposed to the elements, and portions of the machine being unguarded. If evidence shows a co-employee supervisor received complaints or expressions of fear about the particular condition resulting in the injury, summary judgment on this requirement for co-employee liability may be inappropriate. *See Case*, 776 P.2d at 196 (Mr. Largent "was uniquely aware of the dangerous condition of the boom given his position as safety coordinator and Case's numerous complaints to him about it.").

[¶28] In *Bertagnolli*, for example, the record disclosed that on the date of his injury, Mr. Bertagnolli specifically asked Mr. Westbrook to stop operation of the shuttle belt moving raw trona ore from one level of the mine to another, while he shoveled an unguarded area clean. *Bertagnolli*, ¶¶ 5–6, 67 P.3d at 629–30. Mr. Bertagnolli requested the union steward be called when Mr. Westbrook and Mr. Louderback refused to do so. *Id.* ¶ 6, 67 P.3d at 629–30. Mr. Bertagnolli submitted an affidavit from a former mine maintenance

supervisor that the policy, practice, and custom at the mine was that no worker was allowed to perform maintenance on the shuttle belt unless it was locked out. *Id.* ¶ 22, 67 P.3d at 634–35. Both supervisors reluctantly acknowledged in their depositions "the extremely hazardous nature of work done in and around the energized shuttle belt and their awareness of numerous ways a worker could be injured through amputation of body parts or even loss of life." *Id.* ¶ 24, 67 P.3d at 635. "However, they denied knowing the sheave wheel, which severed Mr. Bertagnolli's foot, was unguarded." *Id.* "They also denied they had knowledge of any company policy requiring the shuttle belt to be locked out under the circumstances which existed on the night of the accident, Mr. Bertagnolli requested a union steward, or they threatened to terminate his employment if he did not work as instructed." *Id.* We concluded that a fact-finder could interpret the supervisors' testimony as evidence they knew of the dangers and risk of serious injury or death in the shuttle belt area. *Id.* ¶ 25, 67 P.3d at 635.

[¶29] Though the complaints alleged to have been made in this case were not as specific and contemporaneous as the complaint Mr. Bertagnolli made, Mr. Ramirez nevertheless submitted admissible evidence indicating that he, Mr. Peterson, and Mr. Willden complained to either Mr. Mitchell or Mr. Brown, or both, about the very conditions that contributed to Mr. Ramirez's injury. And it was undisputed Mr. Wartenbee receives and enters information from the employees' "stop" or "dragon cards" into the database.

[¶30] Mr. Ramirez testified that in 2016 he talked to Mr. Mitchell twice about covering the machine. He and Mr. Mitchell first talked about "[t]he falls that different people had suffered" and "to see if we could have that [cover] extended." Mr. Ramirez clarified that he personally saw Mr. Gudino and "Jorge" fall adjacent to or while operating the spin-straightener. Later that year, when Mr. Mitchell approached Mr. Ramirez to talk about some pipes they were straightening, Mr. Ramirez "mentioned to him that we needed to extend that cover out a little bit because we had slipped and fallen several times." Mr. Mitchell "said okay, that he would talk to his bosses about it."

[¶31] Mr. Peterson, who worked at the facility from October 2013 until August 2014 and then again from May 2015 to March 2016, testified at his deposition that he and Mr. Mitchell had discussed covering the machine. They "talked about how it [] would be a good idea to close it in and enclose it from the elements because of the ice and snow buildup and the sun in the summertime."

[¶32] Mr. Gudino, who worked at the facility for approximately six months beginning in October 2015, testified at deposition that he filled out two "stop cards" about the machine—one about oil on the floor because the machine leaked and one regarding extending the cover over the machine and guarding it. Mr. Mitchell followed up with him and remedied the oil problem. Mr. Mitchell did not follow-up with him about the guards or covering the machine.

[¶33]   Mr. Willden worked at the facility from approximately 2014 to 2017.   His affidavit stated he was familiar with the spin-straightener and occasionally worked on it even though he did not like to do so.   He stated that "[b]efore [Mr. Ramirez] got hurt, [Mr. Willden] told both Elvin Brown and Bryce Mitchell on at least two occasions that the pipe straightening machine needed to be covered and guarded."   "Each time their response was something like, 'We'll see what we can do,' but nothing was done."   Mr. Willden further stated he also "turned in at least one and maybe more than one written card that identified the pipe straightening machine as being dangerous, and stating that it needed to be guarded and the work area covered."

[¶34]   Mr. Ramirez's expert, Mr. Muller, opined in his affidavit that each of the three co-employee supervisors "had actual knowledge of the hazards or serious nature of the risk involved."   Here again, Mr. Muller's categorical assertion of an ultimate fact cannot be used to defeat summary judgment.   *Brebaugh*, 788 P.2d at 1140.   But Mr. Ramirez's evidence pertaining to the Job Hazard Analysis, various employees' complaints to Mr. Mitchell and Mr. Brown about the conditions around and safety of the spin-straightener, and Mr. Wartenbee's responsibility to review and enter those complaints into the database is enough to establish genuine issues of material fact on the knowledge requirement.   *See Case*, 776 P.2d at 196–97.

[¶35]   We acknowledge that Mr. Mitchell and Mr. Brown adamantly denied receiving any such complaints.   However, we will not make credibility determinations concerning whether Tuboscope employees did or did not complain about the machine's safety on summary judgment.   *See Little Med. Creek Ranch, Inc. v. D'Elia*, 2019 WY 103, ¶ 40, 450 P.3d 222, 233 (Wyo. 2019).   Examining the record from the vantage point most favorable to Mr. Ramirez, and giving him the benefit of all favorable inferences as we must, we conclude the question whether one or more of Mr. Ramirez's co-employee supervisors knew there was a high probability that Mr. Ramirez was in danger of serious injury must be resolved at trial.

### C. Willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result.

[¶36]   Finally, Mr. Ramirez must establish a genuine issue of material fact as to whether Mr. Brown, Mr. Wartenbee, and Mr. Mitchell each willfully disregarded the need to cover and guard the spin-straightener despite awareness of a high probability that serious injury or death may result.   *Herrera*, ¶ 21, 334 P.3d at 1231.   Mr. Ramirez must present admissible evidence that his co-employees' actions were "willful and not merely inadvertent in nature."   *Formisano*, ¶ 17, 246 P.3d at 291 (quoting *Bertagnolli*, ¶ 17, 67 P.3d at 633).   He must show that each co-employee supervisor "acted with a state of mind approaching intent to do harm or committed an act of an unreasonable character in disregard of known or obvious risks so great as to make it highly probable that harm would follow."   *Id.* (quoting *Bertagnolli*, ¶ 17, 67 P.3d at 633).

11

[¶37] A jury could reasonably infer from Mr. Ramirez's evidence that the spin-straightener should have been guarded. The Company Safety Handbook mirrored the OSHA regulation on guarding, which stated "[o]ne or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation . . . [and] rotating parts[.]" Mr. Muller also opined, based on his training, experience, and review of various materials related to the machine, that the co-employee supervisors "were required to guard the pipe straightening machine (or refit it with a guard) under both Tuboscope policy and OSHA."

[¶38] A jury could also reasonably infer that even though there had been no prior, similar injuries, it was highly probable that serious harm would follow from a slip and fall on snow and ice near an unguarded portion of the spin-straightener.[6] Employees had complained about the slippery conditions and lack of guarding. *See supra* ¶¶ 30–33. As noted above, the Job Hazard Analysis for spin-straightener operators and tail hands identified the danger of being caught in, on or between the machine, and of falling on the same level or from above the machine. Mr. Mitchell and Mr. Wartenbee both acknowledged the serious risks associated with operating a machine without proper guarding.

[¶39] Standing alone, however, these inferences do not create a genuine issue of material fact whether the co-employee supervisors willfully disregarded the high probability of serious injury to Mr. Ramirez. There is a critical distinction "between simple negligence and the 'state of mind that approaches intent to do harm' required by the statute." *Formisano*, ¶ 19, 246 P.3d at 292 (quoting *Loredo v. Solvay Am., Inc.*, 2009 WY 93, ¶ 17, 212 P.3d 614, 627 (Wyo. 2009)). We have repeatedly stated that while asserted violations of safety manuals and regulations "may constitute evidence of ordinary negligence, they do not demonstrate a state of mind consistent with culpable negligence[.]" *Poulos*, 765 P.2d at 366; *see also Morris v. Smith*, 837 P.2d 679, 683 (Wyo. 1992); *Smith v. Throckmartin*, 893 P.2d 712, 715 (Wyo. 1995); *McKennan*, 902 P.2d at 1287–88; *Krier*, 943 P.2d at 417. Moreover, a high probability of serious harm does not singularly evidence the requisite intent. The record must also contain some evidence the co-employee supervisors intentionally rather than inadvertently disregarded that probability of serious harm.

[¶40] We found no evidence to indicate either Mr. Brown or Mr. Wartenbee intentionally disregarded the risk of harm to Mr. Ramirez. The evidence instead suggests each had

---

[6] Mr. Ramirez submitted evidence pertaining to very different types of injuries on the machine than the one he suffered. Those injuries related mainly to pipes breaking or snapping in the machine and being flung from it, and tail hands injuring their hands or backs while unloading or loading the machine. There is no evidence in the record indicating anyone suffered an injury similar to Mr. Ramirez's on the spin-straightener. Though we have suggested probability can be shown by evidence of prior, similar injuries, *see Vandre*, ¶ 18, 310 P.3d at 924, we have never held that probability of harm can only be established by proof that similar injuries had previously occurred. The fact that no one had been previously injured on the spin-straightener therefore is not dispositive.

knowledge of a hazardous condition and failed to correct it. Knowledge and inaction "is not sufficient to satisfy the much more stringent test of culpable negligence." *Loredo*, ¶ 17, 212 P.3d at 627 (quoting *Cockburn v. Terra Resources, Inc.*, 794 P.2d 1334, 1344 (Wyo. 1990)). Viewing the evidence and related inferences in a light most favorable to Mr. Ramirez, the most that can be said about Mr. Brown's and Mr. Wartenbee's conduct is they had more attenuated knowledge of Tuboscope employees' complaints concerning the uncovered and unguarded portions of the spin-straightener than did Mr. Mitchell, and they failed to address those concerns. Their failure to cover or guard the spin-straightener under these circumstances may constitute ordinary negligence, but the circumstances do not establish a state of mind consistent with culpable negligence. *Id.* Mr. Brown and Mr. Wartenbee are therefore entitled to judgment as a matter of law.

[¶41] Mr. Ramirez did, however, present a modicum of evidence sufficient to distinguish Mr. Mitchell's conduct from Mr. Brown's, the other on-site supervisor's, conduct. It is this evidence and distinction which prevents us from affirming summary judgment in Mr. Mitchell's favor.

[¶42] Like Mr. Brown, Mr. Mitchell adamantly denied receiving complaints about the spin-straightener. Mr. Ramirez submitted evidence squarely contradicting both Mr. Brown's and Mr. Mitchell's denials. *See supra* ¶¶ 30–33. But, unlike the evidence pertaining to Mr. Brown, it is undisputed that Mr. Mitchell was supposed to report any complaints he received to Mr. Brown and Mr. Wartenbee. The record suggests he reported none of the complaints concerning the spin-straightener to either Mr. Brown or Mr. Wartenbee. If proven true, Mr. Mitchell's failure to report verbal complaints or submit stop cards could reflect an intent not to act, in willful disregard of the serious risk posed to Mr. Ramirez and others. *See Case*, 776 P.2d at 195–96 ("We can reasonably infer that Largent's destruction of the maintenance request and his failure to act may have risen to the level of an intent to not act, 'in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to [Case].'").

[¶43] "When 'the evidence leads to conflicting interpretations or if reasonable minds might differ, summary judgment is improper.'" *Herrera*, ¶ 17, 334 P.3d at 1230 (quoting *Jasper v. Brinckerhoff*, 2008 WY 32, ¶ 10, 179 P.3d 857, 862 (Wyo. 2008)). This record contains conflicting evidence as to the nature and number of complaints Mr. Mitchell received and whether he reported any of those complaints to Mr. Brown or Mr. Wartenbee, who could then have decided whether and, if so, how to address the employees' safety concerns. Looking at the record from the vantage point most favorable to Mr. Ramirez, and giving him the benefit of all favorable inferences as we must when reviewing an order on summary judgment, the evidence indicates Mr. Mitchell was uniquely aware of multiple safety concerns about the spin-straightener, including concerns about slipping and falling and the lack of adequate guarding. Yet Mr. Mitchell failed to report those concerns to the

13

other supervisors as he was supposed to do. We conclude the facts as to whether Mr. Mitchell's inaction was willful or merely inadvertent are in genuine dispute and should be decided by a jury after receiving and evaluating all the evidence and testimony. *Id.* ¶ 18, 334 P.3d at 1230; *Formisano*, ¶ 17, 246 P.3d at 291; *Bertagnolli*, ¶ 17, 67 P.3d at 633.

## *CONCLUSION*

[¶44] Mr. Ramirez failed to establish any genuine issues of material fact whether Mr. Brown and Mr. Wartenbee willfully disregarded the need to act despite awareness of the high probability the spin-straightener could cause serious injury or death. Consequently, they are entitled to judgment as a matter of law and are immune from liability for Mr. Ramirez's injury.

[¶45] While our decision should not be read to prejudge the evidence or strength of Mr. Ramirez's claim against Mr. Mitchell, Mr. Ramirez did establish genuine issues of material fact against Mr. Mitchell as to each of the three co-employee liability requirements. We therefore affirm the district court's order granting summary judgment to Mr. Brown and Mr. Wartenbee, but reverse its order granting summary judgment to Mr. Mitchell, and remand the claim against Mr. Mitchell for trial.

**FOX, Justice,** concurring in part and dissenting in part, in which **KAUTZ, Justice,** joins.

[¶46] The majority significantly lowers the bar for finding co-employee liability when it concludes that there are genuine issues of material fact with respect to Mr. Ramirez's claims against Mr. Mitchell. I therefore dissent to that portion of the majority opinion.

[¶47] We begin with the recognition that the Wyoming Worker's Compensation Act provides rights and remedies "in lieu of" any other rights and remedies a covered employee may have against an employer for on-the-job injuries. *Formisano v. Gaston*, 2011 WY 8, ¶ 15, 246 P.3d 286, 290 (Wyo. 2011); Wyo. Stat. Ann. § 27-14-104(a) (LexisNexis 2019). The legislature created an exception to employer and co-employee immunity when co-employees "intentionally act to cause physical harm or injury to the injured employee." Wyo. Stat. Ann. § 27-14-104(a). As we have repeatedly recognized, a co-employee is not liable if he is merely negligent. *Formisano*, 2011 WY 8, ¶ 16, 246 P.3d at 290; *Cockburn v. Terra Resources, Inc.*, 794 P.2d 1334, 1344 (Wyo. 1990); *Herrera v. Phillipps*, 2014 WY 118, ¶ 18, 334 P.3d 1225, 1230 (Wyo. 2014). The majority correctly states that "willful and wanton misconduct" is required in order to find co-employee liability; and, in this case, that means there must be a genuine issue of material fact that Mr. Mitchell "(1) had knowledge of the hazard or serious nature of the risk the spin-straightener presented to Mr. Ramirez, (2) [was] responsible for Mr. Ramirez's safety and work conditions, and (3) willfully disregarded the need to act despite [his] personal awareness of the high probability that serious injury or death may result . . . ." I have no dispute with the majority's statement of the law governing co-employee liability, but I differ with its application of the law to the facts of this case.

[¶48] The majority relies on various complaints regarding "the very conditions that contributed to Mr. Ramirez's injury." Those complaints consisted of: two requests by Mr. Ramirez to extend the covering adjacent to the spin-straightener to avoid slipping and falling; Mr. Peterson's discussion with Mr. Mitchell that "it would be a good idea" to cover the area; Mr. Gudino's report about extending the cover, and that the pipe straightener "needed guards"; Mr. Willden's report to Mr. Mitchell that he thought the spin-straightener should be covered and guarded. This, the majority concludes, is sufficient to determine there are genuine issues of material fact that Mr. Mitchell had knowledge "there was a high probability that Mr. Ramirez was in danger of serious injury . . . ." I disagree.

[¶49] These vague and non-contemporaneous reports do not rise to the level of any of the evidence supporting the knowledge element in our precedent. In *Bertagnolli v. Louderback*, 2003 WY 50, 67 P.3d 627 (Wyo. 2003), our seminal co-employee liability case, the co-employee supervisors were well aware of the mine's policy, practice, and custom that it was unsafe to work on the shuttle belt unless it was locked out; they recognized the "extremely hazardous nature of work done in and around the energized shuttle belt"; and they were aware "of numerous ways a worker could be injured through amputation of body parts or even loss of life." *Id.* at ¶¶ 21, 24, 67 P.3d at 634-35. Further,

15

when Mr. Bertagnolli objected to working on the shuttle belt unless it was locked out, his supervisors instructed him to proceed, which he did under threat of being fired. *Id.* at ¶ 21, 67 P.3d at 634. In *Bertagnolli*, we relied on *Case v. Goss*, where we reversed summary judgment in favor of the co-employee supervisors who had been "apprised of the dangerous condition, failed to take reasonable steps to remedy [it], and overtly threatened to fire the reporting employee who was ultimately injured." *Id.* at ¶ 18, 67 P.3d at 633 (citing *Case v. Goss*, 776 P.2d 188 (Wyo. 1989)).[7] Similarly, in *Hannifan v. American Nat'l Bank of Cheyenne*, 2008 WY 65, ¶ 22, 185 P.3d 679, 689 (Wyo. 2008), the mine high walls were "inherently dangerous," and those where Mr. Butts was working were especially so because they were too steep and not in compliance with the mine plan. The location where Mr. Butts was working was the only one at the coal mine without catch benches, the benches that did exist were too full to be effective, and the boxcut was too narrow. There had been a prior "slough incident" like the one that injured Mr. Butts, which "gave an early warning of nascent problems with the high walls," but nothing was done to address those problems. The equipment Mr. Butts was operating did not have the required safety systems. *Id.* at ¶ 22, 185 P.3d at 689. And again, the co-employee supervisors had been specifically warned about the danger of the situation, in this case by the safety advisor, on the day preceding the accident that injured Mr. Butts. In *Herrera*, 2014 WY 118, 334 P.3d 1225, the co-employee supervisor violated express policy on the amount of pipe exposed and the requirement that it be anchored and, when Mr. Herrera suggested the procedure was unsafe and that the pressure be turned off before proceeding, his supervisor told him, "I am the boss, and you will do what I say." *Id.* at ¶ 19, 334 P.3d at 1231.

[¶50] In each of these cases, the co-employee supervisors had knowledge of the specific dangerous conditions or instrumentality that caused injury to the plaintiffs, including being told specifically either by the injured worker or by a safety advisor, at or near the time of the injury, that this particular activity was unsafe. There are simply no facts to support such a finding in this case.

[¶51] Instead, the facts here more closely resemble those in the many cases where we have found the co-employee did not have sufficient knowledge of the hazard or serious nature of the risk involved. In *Cockburn*, 794 P.2d 1334, we affirmed summary judgment in favor of the co-employee even though the injured worker had expressed his concern to his supervisor that the alligator tails, which eventually caused his injury, were "like a sled," and his supervisor responded, "You let me take care of the rig." *Id.* at 1344. The Court, giving the plaintiff the appropriate inferences on summary judgment, concluded the supervisor "was aware of a dangerous condition relating to the 'alligator tails' prior to the accident, and he failed to remedy the problem in fulfillment of his duty." *Id.* Although

---

[7] *Case* was decided under an earlier version of the statute, but we held in *Bertagnolli* that "the amended standard of 'intentionally act to cause physical harm or injury' equates to willful and wanton misconduct." 2003 WY 50, ¶ 15, 67 P.3d at 632.

that may have been enough to meet a negligence standard, the Court held it was "not sufficient to satisfy the much more stringent test of culpable negligence." *Id.*[8] In *Smith v. Throckmartin*, 893 P.2d 712 (Wyo. 1995), the worker and his co-employee supervisor were loading sand into a sanding truck. The co-employee operating the backhoe struck the metal bar the worker was holding, and the worker lost his balance and fell from the truck. *Id.* at 713. We affirmed summary judgment in favor of the co-employee, concluding there was no "extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.* at 714 (quoting *Case*, 776 P.2d at 191). In *McKennan v. Newman*, 902 P.2d 1285 (Wyo. 1995), we affirmed summary judgment in favor of the co-employee supervisors because the worker did not produce evidence the co-employees "acted with knowledge of the particular danger posed to [the worker] by the chip-augur or that the danger was so obvious that the risk of [the worker's] death was highly probable to result." Instead, "[t]he evidence [was] uncontroverted that there were no previous injuries or deaths associated with the augur which would have put appellees on notice of its dangerous nature." *Id*. at 1288.

[¶52] In *Loredo v. Solvay America, Inc.*, 2009 WY 93, 212 P.3d 614 (Wyo. 2009), the worker was injured when tons of rock fell on him at a trona mine. *Id.* at ¶ 1, 212 P.3d at 616. The worker had been operating a roof bolter which was not functioning correctly, making it difficult to steer. His co-employee supervisor knew of the roof bolter's malfunction, but instructed the worker to proceed until repairs could be made. The worker had also told him on previous occasions "that the sequence and method of mining being used required him to go into areas where the mine roof was not yet bolted," which he knew was dangerous. *Id.* at ¶ 9, 212 P.3d at 618. The worker did end up in an unbolted area, where he was injured. The district court found that, "just prior to his accident," the worker did not inform his supervisor that the roof bolter was unsafe to operate because of the malfunction and, although the worker informed his supervisor of his concern for his safety, the supervisor "never threatened [the worker] with a disciplinary action for notifying him of the" defect. *Id.* at ¶ 17, 212 P.3d at 629. We affirmed summary judgment in favor of the co-employee. *Id.* at ¶ 18, 212 P.3d at 629. In *Formisano*, 2011 WY 8, 246 P.3d 286, we concluded that driving home after a long day's work, which resulted in the co-employee falling asleep and causing an accident, did not rise to the level of an intentional act, or that "a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another." *Id.* at ¶ 16, 246 P.3d at 291 (citation omitted). In *Van Patten v. Gipson*, 2011 WY 98, 253 P.3d 505 (Wyo. 2011), the worker on a drilling rig was instructed to put on a harness and be hoisted above the rig floor to clean the derrick. The co-employees then discovered that it would first be necessary to free the tugger line, so they raised the worker in the harness up under the derrickboard, where, through a series of unfortunate events, the worker was hoisted into the derrickboard and sustained a compression fracture of the thoracic spine. *Id.* at ¶¶ 4-6, 253 P.3d at 506-

---

[8] The Court held its "ruling may be particularly appropriate since the 'alligator tails' had been repeatedly used without any incident." *Cockburn*, 794 P.2d at 1344.

07. The worker had asked his supervisors whether they needed to do a job safety analysis or pre-job checklist, which they did not think was necessary (in fact, it was a violation of company policy not to do so). *Id.* at ¶¶ 7, 17, 253 P.3d at 507, 509. We affirmed summary judgment in favor of the co-employees, concluding there was no evidence they "had knowledge of, and intentionally disregarded, the danger associated with using" the harness in the manner they did; there was no evidence that the worker had objected to using the harness in that manner, "pointed out the danger of doing so or expressed concern for his safety"; there was evidence other workers had done the same thing before without injury; and, unlike in *Hannifan*, there was no warning to co-employee supervisors by a previous injury to another worker, refusal of other workers to work in that area, or expressions of concern to supervisors by still other employees. *Id.* at ¶¶ 27, 30, 253 P.3d at 511-12. Finally, in *Vandre v. Kuznia*, 2013 WY 127, 310 P.3d 919 (Wyo. 2013), the worker was injured when he was hit and dragged by a road-paving machine. *Id.* at ¶ 3, 310 P.3d at 920. The driver of the paver had indicated that he did not like driving it because it had a blind spot; nevertheless, the co-employee supervisors instructed him to proceed, and the worker was struck. We held that the co-employees' conduct "may arguably have been a thoughtless error in judgment, [but that it did] not rise to the level of willful misconduct." *Id.* at ¶ 18, 310 P.3d at 924. Although they were aware of the blind spot, there was "no evidence demonstrating that [they] knew of the hazard or serious nature of the risk involved in directing [the driver] to move the paver under the circumstances." *Id.* We held:

> Unlike *Bertagnolli*, where evidence established the supervisors' knowledge of the general risks of working near the shuttle belt, here the evidence shows the risk that someone would be hit by the paver during mobilization was a mere possibility that had never happened before. The danger involved in driving the paver was not obvious and the risk of Vandre's injuries were not highly probable.

*Id.*

[¶53]  The facts of this case are much more like those in the *Cockburn*-to-*Vandre* line of cases than the *Case*-to-*Herrera* line. Here, the spin-straightener had been in operation for roughly 30 years without any similar accident. Mr. Ramirez had operated the spin-straightener regularly for approximately three years, he considered himself an expert at operating the spin-straightener, and he requested to operate it because he wanted the overtime. Although he testified he had suggested, prior to the time of the accident, a better covering was needed to avoid the accumulation of snow and ice, he had operated it on many occasions when snow and ice was present, he never indicated a concern for falling into the machine, and he never complained that the guarding was inadequate. He acknowledged it was his responsibility to clear the snow away from his work area. He did not object to operating the machine on the day of the accident, and there is no suggestion he was instructed to proceed over any objection. Two workers testified they turned in "stop

cards" indicating the spin-straightener needed guarding at some time prior to the accident, but without any specificity about the concern regarding guards.

[¶54] These facts do not rise to the level of notice the co-employee supervisor received in *Cockburn*, where the injured worker had specifically told his supervisor the alligator tails were "like a sled," and we nevertheless held that the worker had not met the culpable negligence standard. The notice here, like the notice in *McKennan*, is insufficient to raise a genuine issue of material fact that Mr. Mitchell "acted with knowledge of the ***particular*** danger posed . . . ." *McKennan*, 902 P.2d at 1288 (emphasis added). These facts are much more like those in *Vandre*, where the supervisors were aware of the dangers of the blind spot on the paver, they had overridden the driver's concerns about driving the paver, but there was no evidence they knew of the danger of moving the paver "***under the circumstances***." *Vandre*, 2013 WY 127, ¶ 18, 310 P.3d at 924 (emphasis added). Instead, Mr. Ramirez's accident was a "mere possibility that had never happened before." Our caselaw is clear that the knowledge required for finding co-employee liability must be more particularized than the vague and general notice that, giving Mr. Ramirez all favorable inferences, Mr. Mitchell received regarding the spin-straightener. Here, as in *Vandre*, the dangers of operating the spin-straightener were not obvious and the risks of Mr. Ramirez's injury were not highly probable. This is particularly true when there were no prior injuries, and no contemporaneous objection to a potentially dangerous situation. Mr. Ramirez went about operating the machine as he had for three years (though without clearing the snow this time). Mr. Mitchell, like the co-employee supervisor in *Loredo*, had been informed of two separate concerns—the risk of slipping on snow and ice and the need for a guard on the spin-straightener. In *Loredo*, we held that two separate concerns aligning to result in a very unfortunate accident when rock fell onto the worker from the mine roof did not create the requisite knowledge on the part of the supervisor. Likewise, the separate and non-contemporaneous complaints of slipping on snow and an unguarded machine do not create the requisite knowledge on Mr. Mitchell's part.[9] Mr. Mitchell testified that he believed the spin-straightener operation was safe. The burden then shifted to Mr. Ramirez to present evidence showing that there are genuine issues of material fact that Mr. Mitchell had notice that there was a high probability of serious injury to Mr. Ramirez. I would conclude he has not met that burden.

[¶55] Because I would not find the knowledge element is met, I would not proceed to the willful disregard element, but I would certainly dispute the majority's conclusion that Mr. Mitchell's failure to report the complaints up the chain of command is a sufficient basis for finding "an intent not to act, in willful disregard of the serious risk posed to Mr. Ramirez and others." First, as discussed above, the "serious risk" was not as apparent as the law

---

[9] Although the majority relies in part on the inference that the lack of guarding was a violation of the Company Safety Handbook and OSHA regulation, it also concedes that such violation "may constitute evidence of ordinary negligence, [but] do not demonstrate a state of mind consistent with culpable negligence."

19

requires for co-employee liability. The majority's reliance on *Case* for this proposition omits key facts in that case. There, Mr. Case was injured when he slipped after stepping onto a grease spot on a coal mine dragline. 776 P.2d at 190. He had complained to Mr. Largent, the mine's safety coordinator, about the specific condition before his accident and submitted a maintenance request for it to be cleaned, which Mr. Largent responded to by ripping it up and telling the worker it was not his place to be writing such requests. *Id.* at 195. This Court found that "Largent was uniquely aware of the dangerous condition of the boom given his position as safety coordinator and Case's numerous complaints to him about it; yet, even after receiving a maintenance request from Case, Largent failed to act to remedy the situation." *Id.* at 196. Not only did Mr. Mitchell not have knowledge of the particular danger that ultimately caused Mr. Ramirez's injury, but his failure to act is not nearly so blatant and reprehensible as Mr. Largent's. It does not approach the conduct of the co-employee supervisors in *Bertagnolli*, *Hannifan*, and *Herrera*, where the supervisors expressly overrode the specific objections to the working conditions that led to the workers' injuries.

[¶56] For these reasons, I would affirm summary judgment in Mr. Mitchell's favor, as well as in favor of Mr. Brown and Mr. Wartenbee.

20